IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MARK BONK, as trustee of the Harry | ) | |
| and Patricia Bonk Irrevocable Trust, | ) | |
| HARRY BONK and PATRICIA BONK, | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. 06-285 (UNA) |
| | ) | |
| v. | ) | |
| | ) | |
| RICHARD WEZNER, JOHN HANCOCK | ) | |
| MUTUAL LIFE INSURANCE CO. and | ) | |
| METLIFE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
LEAVE TO FILE FIRST AMENDED COMPLAINT**

R. KARL HILL (DE2747)
khill@svglaw.com
PATRICIA P. MCGONIGLE (DE3126)
pmcgonigle@svglaw.com
SEITZ, VAN OGTROP & GREEN, P.A.
222 Delaware Avenue, Suite 1500
Wilmington, Delaware  19801
Telephone (302) 888-0600
Facsimile (302) 888-0606
Attorneys for Plaintiffs

Dated:  November 9, 2007

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES…………………………………………………………………. ii

PRELIMINARY STATEMENT……………………………………………………… 1

ARGUMENT………………………………………………………………………. 1

    I.    <u>Plaintiffs' Negligent Supervision Claim Against MetLife
Is Not Time-Barred</u>............................................................................. 1

    II.    <u>The Negligent Supervision Claim "Relates Back" to the
Original Complaint</u>……………………………………………………… 3

    III.    <u>Alternatively, The Statute of Limitations Applicable To A Negligent
Supervision Claim Was Tolled</u>……………………………………… 6

CONCLUSION………………………………………………………………………. 8

# <u>TABLE OF AUTHORITIES</u>

Page

<u>Cases</u>

<u>Cupertino v. Marra,</u>
    1992 WL 297430 (D. Md. 1992) *aff'd* 981 F.2d 1250 (4th Cir. 1992)……………………  4

<u>Finley Associates, Inc. v. Sea & Pines Consolidated Corp.,</u>
    714 F. Supp. 110 (D. Del. 1989)……………………………………………………………  3

<u>Guveiyian v. Keefe,</u>
    1998 WL 199843 (E.D.N.Y. 1998)…………………………………………………………  4

<u>Hill v. Equitable Bank, N.A.,</u>
    599 F. Supp. 1062 (D. Del. 1984)………………………………………………..…......  3

<u>In re Dean Witter Partnership Litigation,</u>
    1998 WL 442456 (Del. Ch. 1998)………………………………………………………..  6

<u>Isaacson, Stolper & Co. v. Artisan's Sav. Bank,</u>
    330 A.2d 130 (Del. 1974)…………………………………………………………………  6

<u>Island Farm, Inc. v. Master, Sidlow & Associates, P.A.,</u>
    2007 WL 2758775 (Del. Super. 2007)……………………………………………………  6

<u>The Lodge at Bolton Valley Condominium Association v. Hamilton,</u>
    905 A.2d 611 (Vt. 2006)…………………………………………………………………  5

<u>Oakes v. Gilday,</u>
    351 A.2d 85 (Del. Super. 1976)…………………………………………………………...  3

<u>Pack & Process, Inc. v. Celotex Corp.,</u>
    503 A.2d 646 (Del. Super. 1985)…………………………………………………………  6

<u>Perkins v. Windsor Hospital Corp.,</u>
    455 A.2d 810 (Vt. 1982)…………………………………………………………………  4, 5

<u>Red Bird Egg Farms, Inc. v. Agway Ins. Co.,</u>
    1995 WL 413300 (Del. Super. 1995)……………………………………………………..  4

<u>Yorden v. Flaste,</u>
    374 F. Supp. 516 (D. Del. 1974)…………………………………………………………  3

Page

**<u>Rules</u>**

Fed. R. Civ. P. 15(a)……………………………………………………………..  5

Fed. R. Civ. P. 15(c)……………………………………………………………..  3, 6

**<u>Treatises</u>**

6A C. Wright, A. Miller & M, Kane, *Federal Practice and Procedure* §1497 (2d ed. 199)...  5

J. Moore, *Moore's Federal Practice* ¶15.15[2] (1987)……………………………………  3

## PRELIMINARY STATEMENT

Defendant MetLife, Inc. ("MetLife") is the only defendant to file any opposition to Plaintiffs' Motion for Leave to File First Amended Complaint (the "Motion").  While MetLife opposes the proposed amendment in so far as it seeks to assert a negligent supervision claim against MetLife, MetLife does not oppose the substitution of MetLife Securities, Inc. ("Securities") and Metropolitan Life Insurance Company ("MetLife Insurance") as defendants in this matter.  Furthermore, MetLife takes no position with respect to the new factual allegations asserted in paragraphs 11-14 as they do not pertain to MetLife and/or Mr. Wezner's relationship with MetLife. *See, MetLife, Inc.'s Opposition to Plaintiffs ' Motion for Leave to File First Amended Complaint*, at p. 1, fn. 1. Accordingly, the Motion and proposed amendments relating to defendants other than MetLife should be summarily granted by this Court.

MetLife's only basis for opposing the proposed amendment asserting a claim of negligent supervision against it is that the amendment would be futile as barred by the statute of limitations.  MetLife's analysis is flawed, the proposed amendment is not futile, and the Motion should be granted.

## ARGUMENT

I.      Plaintiffs' Negligent Supervision Claim Against MetLife Is Not Time-Barred.

Defendant Richard Wezner ("Wezner") was employed by MetLife Insurance and/or Securities[1] from on or about March, 1999 to April, 2005. [Proposed Amended Complaint, ¶3][2]  During this entire period of employment, Plaintiffs contend MetLife had an obligation to properly supervise Wezner.  MetLife's duty to properly supervise Wezner did not stop until such time as Wezner ceased being an employee of MetLife in April 2005.

---

[1] Throughout the Argument, "MetLife" will be used to refer to both MetLife Insurance and Securities.
[2] A copy of the proposed First Amended Complaint is attached to the Motion as Exhibit A.

In the proposed First Amended Complaint, Plaintiffs set forth a _non-exclusive_ listing of MetLife's negligent acts in supervising Wezner, including failing to ensure the suitability of the variable life policies sold to Plaintiffs, failing to detect Wezner's fraudulent activities, including failing to question suspect address changes and changes to beneficiary designations, and failing to verify trust information. [Proposed Amended Complaint, ¶72]  These new allegations, and the associated legal claim for negligent supervision, are based on documents produced by MetLife (and the other defendants) in July, 2007 and the report of Plaintiffs' expert, Raymond Ianni (the "Report")[3], prepared following his review of these documents.[4]

In its effort to prove the alleged futility of the negligent supervision claim, MetLife tries to set the commencement of the running of the three-year statute of limitations for any negligent supervision claim at July 15, 2003 – the issuance date of MetLife Policy No. 6720566. However, Plaintiffs' negligent supervision claim is not limited to a lone fraudulent act by Wezner when he induced Plaintiffs to purchase this policy in July, 2003.  Rather, the negligent supervision claim is far broader (as set forth in the proposed First Amended Complaint), and spans the entire period of time that Wezner was employed by MetLife. As the Report makes clear, Wezner engaged in a systematic scheme to defraud Plaintiffs during his employment with MetLife.  MetLife's failure to properly supervise Wezner directly contributed, and in fact, assisted in perpetrating this scheme, which went undetected until shortly before Wezner ceased employment with MetLife.  *See,* Report of Raymond Ianni, pp.6-10.  Given's MetLife's ongoing failure to properly supervise Wezner, a cause of action for negligent supervision should be found to have accrued when MetLife's duty to supervise ceased – that being in April, 2005 when

---

[3] A copy of the Report was provided to defendants on September 20, 2007.  A true and correct copy of the Report is attached hereto as Exhibit "A".
[4] As the Court will recall, as a result of the Motion for Protective Order filed by Wezner in August, 2006, and related issues surrounding Wezner's ability to participate in this action, no discovery occurred for close to ten (10) months. In June 2007, the Court instructed the parties to resume discovery.

Wezner stopped being an employee of MetLife.  As such, the proposed amendments against MetLife as set forth in the First Amended Complaint are timely-filed, having been brought well within the applicable three-year statute of limitations.

II.     <u>The Negligent Supervision Claim "Relates Back" to the Original Complaint</u>

Even if the Court were to determine the proposed negligent supervision claim was not filed within the applicable three-year statute of limitations, the claim should be deemed to "relate back" to the date of the original complaint.  Under Rule 15(c), whenever a claim asserted in an amended pleading arises out of the conduct, transaction, or occurrence set forth in the original pleading, the amendment relates back. Fed.R.Civ.P. 15(c).  Importantly, the "objective of [Rule 15(c)] is to broaden the meaning of the concept of 'cause of action,' shifting the emphasis from a theory of law as to the cause of action, to the specified conduct of the defendant upon which the plaintiff relies to enforce his claim." <u>Oakes v. Gilday</u>, 351 A.2d 85, 89-90 (Del. Super. 1976) (citations omitted).  As this Court has noted, the "same transaction" test of Rule 15(c) is not "mechanical or restrictive"; rather, the Court should examine whether the original pleading provides defendant with adequate notice of the ***general fact situation*** upon which the amended claim is based. <u>Finley Associates, Inc. v. Sea & Pines Consolidated Corp.</u>, 714 F. Supp. 110, 116 (D.Del. 1989) (emphasis added) *citing* <u>Hill v. Equitable Bank, N.A.</u>, 599 F.Supp. 1062 (D.Del. 1984) and J. Moore, *Moore's Federal Practice* ¶15.15[2], at 15-144 (1987).   Rule 15(c) "should be read together with [the] general provision of Rule 15(a) that leave to amend shall be freely given…when justice so requires." <u>Id.</u> *citing* <u>Yorden v. Flaste</u>, 374 F.Supp. 516, 518-519 (D.Del. 1974).

MetLife, citing two (2) non-precedential cases from Maryland and New York[5], argues the proposed negligent supervision claim can not "relate back" since "plaintiffs assert no direct claims" against MetLife in the original complaint. MetLife is wrong.

MetLife was on notice since the filing of the original complaint of the "general fact situation" giving rise to Plaintiffs' claims. MetLife's employee engaged in a systematic scheme to defraud MetLife insureds, including Plaintiffs. Plaintiffs would seek to hold MetLife responsible for the conduct of Wezner, for the benefits MetLife obtained as a result of Wezner's actions, and for the harm suffered by Plaintiffs. In the original complaint, Plaintiffs asserted a direct claim for restitution for unjust enrichment (Count III) against all defendants, including MetLife. Further, Plaintiffs sought a declaration that MetLife be required to provide Plaintiffs with policies of insurance bearing the same terms and benefits as the Original Life Policies (as defined in the Complaint) (Count VIII). And, as pointed out by MetLife, Plaintiffs sought to impute the actions of Wezner to MetLife on the basis of respondeat superior. The proposed negligent supervision claim is simply a new cause of action "based on the *same* series of incidents set out in the complaint." <u>Red Bird Egg Farms, Inc. v. Agway Ins. Co.</u>, 1995 WL 413300, *5 (Del. Super. 1995) [6] ("In effect, based on the *same* series of incidents set out in the complaint plaintiff wishes to add a negligence cause of action. This is permissible.").

In <u>Perkins v. Windsor Hospital Corp.</u>, 455 A.2d 810 (Vt. 1982), the Vermont Supreme Court held the trial court committed reversible error in refusing to allow a plaintiff to amend her complaint against a hospital to clarify a respondeat superior claim and to assert a direct negligence claim against the hospital. The <u>Perkins</u> plaintiff brought suit against the defendant

---

[5] *See*, <u>Cupertino v. Marra</u>, 1992 WL 297430 (D. Md. 1992) *aff'd* 981 F.2d 1250 (4th Cir. 1992) and <u>Guveiyian v. Keefe</u>, 1998 WL 199843 (E.D.N.Y. 1998) (attached to MetLife's Opposition to Motion as Exhibits "B" and "C" respectively).

[6] A copy of this decision is attached to MetLife's Opposition to Motion as Exhibit "A".

doctor alleging negligence in the prescription of a certain drug and for failing to obtain plaintiff's informed consent. The hospital was named as a co-defendant on the basis of respondeat superior. 455 A.2d at 812. On the day the jury was seated, the plaintiff sought to amend the complaint to assert a direct negligence claim against the hospital. Id. at 815. The hospital opposed the motion to amend, arguing the cause of action was "a new claim" and further, was time-barred. The trial court denied the motion. Id.

The Supreme Court of Vermont found the trial court's denial of plaintiff's motion to amend on the ground that the proposed amendment stated a "new cause of action – direct negligent [against the hospital]" and that it was time-barred to be error. Id. Applying the principles of Rule 15(a) and (c), the court wrote:

> It was error to refuse to allow the direct negligence amendment. The negligence claim arose out of the conduct or occurrence set forth in the original complaint. The defendant hospital had notice from the beginning of this action that plaintiff sought to hold it responsible for the harm she suffered as a result of the [prescriptive drug] treatment.

Id. at 816; Accord, The Lodge at Bolton Valley Condominium Association v. Hamilton, 905 A.2d 611 (Vt. 2006) (quoting 6A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure §1497, at 85 (2d ed. 1990) (the "rationale of the relation back rule is to ameliorate the effect of the statute of limitations").

Here, MetLife had fair and adequate notice from the original complaint of the nature of Plaintiffs' claims and that Plaintiffs sought to hold MetLife responsible for the harm suffered. The transactions and occurrences underlying the original claims are Wezner's fraudulent schemes.[7] Those same schemes underlie the proposed amendments and Plaintiffs merely seek to

---

[7] Documents produced to Plaintiffs by MetLife on July 13, 2007 disclosed that MetLife had begun its own investigation into the suspect conduct of Wezner as early as August 2004. Further, in June 2005, MetLife filed a report with the National Association of Securities Dealers ("NASD") alleging various misconduct by Wezner, including commingling of client funds, maintaining address control over customer contacts,

assert a direct negligence claim against MetLife for its role in allowing those schemes to go unchecked.    The requirements of Rule 15(c) are satisfied and the proposed amendments should be deemed to "relate back" to the date of the original complaint.

III.    <u>Alternatively, The Statute of Limitations Applicable To A Negligent Supervision Claim Was Tolled.</u>

The "time of discovery" rule "permits the Court to toll the statute of limitations where there is evidence of concealment or fraud, or where the injury is 'inherently unknowable and the claimant is blamelessly ignorant of the wrongful act and the injury complained of.'" <u>Island Farm, Inc. v. Master Sidlow & Associates, P.A.</u>, 2007 WL 2758775, *2 (Del. Super. 2007) (copy attached hereto as Exhibit "C").    To avail themselves of this doctrine, there must have been "no observable or objective factors" to put Plaintiffs on notice of an injury, and Plaintiffs themselves must have been "blamelessly ignorant" of the acts or omissions and resulting injury. *See*, <u>In re Dean Witter Partnership Litigation</u>, 1998 WL 442456, *5 (Del. Ch. 1998) (copy attached hereto as Exhibit "D").    Plaintiffs can establish "'blameless ignorance' by showing justifiable reliance on a professional or expert whom they have no ostensible reason to suspect of deception." <u>Id.</u> *citing* <u>Isaacson, Stolper & Co. v. Artisan's Sav. Bank</u>, 330 A.2d 130, 133-34 (Del. 1974) (applying "'discovery rule' in light of relationship of  'confidence and reliance by plaintiff on the expertise of defendant.'").    And, the limitations period will be tolled until such time as the plaintiff had "reason to know" that a wrong had been committed. <u>Id.</u> *citing* <u>Pack & Process, Inc. v. Celotex Corp.</u>, 503 A.2d 646, 650 (Del. Super. 1985).

---

altering company records regarding ownership change requests and selling customer policies to life settlement companies – essentially, all things Wezner is alleged to have done to Plaintiffs.  *See,* Exhibit "B" hereto (MetLife documents MP285500001289-1293.

Here, Plaintiffs were blamelessly ignorant of the alleged fraudulent scheme of Wezner and the internal actions at MetLife he took to perpetrate those schemes. As set forth in Plaintiffs' responses to interrogatories[8], Wezner handled all of the Plaintiffs insurance needs since the early 1990s. Plaintiffs had confidence in Wezner and relied upon him for his expertise in insurance matters – Plaintiffs essentially viewed Wezner as their fiduciary. Wezner routinely presented proposed transactions to Plaintiffs at their home (on weekends) informing Plaintiffs they could reduce their premiums by going with another company. Wezner would have Plaintiffs execute applications and related documents saying his office would complete the paperwork and fill-in any missing information on Monday, the next business day. While these schemes were underway, Plaintiffs did not suspect anything was wrong – they continued to pay premiums, they understood they had coverage, and Wezner continued to advise them.

In furtherance of his fraudulent scheme, Wezner took certain internal actions while employed by MetLife. MetLife's own investigation reveals that it suspected that Wezner of many improper actions, including commingling client funds, maintaining address control over customer contracts, altering company records regarding ownership changes, engaging in unreported outside business activities, diverting payments to himself, and selling customer policies to life settlement companies. *See*, Exhibit "B" hereto. If MetLife was not aware of Wezner's internal fraudulent activities until June 2005 (when MetLife filed its allegations with the NASD), how is that Plaintiffs, if MetLife's position is accepted, should have known they possessed a claim for negligent supervision against MetLife that accrued in July 2003.

The bottom line is that Plaintiffs had no way to know that MetLife failed to properly supervise Wezner until such time as MetLife produced documents in this case – which was in the

---

[8] A true and correct copy of Plaintiffs' Answers and Objections to Defendant John Hancock's First Set of Interrogatories is attached hereto as Exhibit "E". See specifically, Plaintiffs' response to Interrogatory No. 3.

summer of 2007.[9]  It was after the review of these documents that Plaintiffs determined a claim for negligent supervision was proper as against MetLife.  And, Plaintiffs have brought this claim within three-years of discovery, making it timely-filed.

## CONCLUSION

For the foregoing reasons, and authorities cited herein, Plaintiffs respectfully request their Motion for Leave to File First Amended Complaint be granted.

Respectfully submitted,

SEITZ, VAN OGTROP & GREEN, P.A.

*/s/ Patricia P. McGonigle*

_____
R. KARL HILL (DE2747)
khill@svglaw.com
PATRICIA P. MCGONIGLE (DE3126)
pmcgonigle@svglaw.com
222 Delaware Avenue, Suite 1500
Wilmington, Delaware  19801
Telephone (302) 888-0600
Facsimile (302) 888-0606
Attorneys for Plaintiffs

Dated:  November 9, 2007

---

[9] Again, as referenced earlier, discovery was not undertaken during an approximate ten (10) month time period while the Court addressed the issue of Wezner's competence.  Plaintiffs should not be penalized for this lengthy delay, which was in no manner attributable to their actions.

## CERTIFICATE OF SERVICE

I, Patricia P. McGonigle, hereby certify that on this 9th day of November, 2007, I electronically filed the foregoing *Plaintiffs' Reply in Support of Motion for Leave to File First Amended Complaint* (the "Reply") with the Clerk of Court using CM/ECF which will send notification of such filing to counsel of record. Further, I caused a copy of the Reply to be served upon the following counsel via U.S. First Class Mail:

William F. Taylor, Jr., Esquire
McCarter & English, LLP
919 N. Market Street, Suite 1800
Wilmington, DE 19899

Penelope M. Taylor, Esquire
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102

Daniel P. Bennett, Esquire
Mintzer Sarowitz Zeris
  Ledva & Meyers, LLP
1220 N. Market Street, Suite 300
Wilmington, DE 19801

Joseph Grey, Esquire
Stevens & Lee, P.C.
1105 N. Market Street, 7th Floor
Wilmington, DE 19801

William J. Payne, Esquire
Stevens & Lee, PC
620 Freedom Business Center, Suite 200
PO Box 62330
King of Prussia, PA 19406

SEITZ, VAN OGTROP & GREEN, P.A.

*/s/ Patricia P. McGonigle*
_____
PATRICIA P. MCGONIGLE (DE3126)
pmcgonigle@svglaw.com

61787 v1

# EXHIBIT A



**DVFG Advisors, LLC**

1013 Centre Road, Suite 100
Wilmington, DE 19805

Tel: 302.993.8045
Fax: 302.993.8066
Toll Free: 866.504.8679

www.dvfg.com

DVFG ADVISORS, LLC

September 20, 2007

R. Karl Hill, Esquire
Seitz Van Ogtrop & Green PA
222 Delaware Avenue, Suite 1500
Wilmington, DE 19801

RE: Bonk v. Wezner et al.

Dear Mr. Hill:

I have been retained by your firm on behalf of the Plaintiffs to provide expert opinions in this case. For purposes of rendering opinions, I have reviewed the Complaint, documents produced by Plaintiffs, Defendant Met Life, Defendant John Hancock, and a letter dated September 6, 2007 from William Payne, Esquire (and its attachments) to you. I reserve the right to supplement this report based on new or additional information. Finally, all opinions herein are offered with a reasonable degree of certainty in respect to insurance practice, and the placement of life insurance in general.

A summary of documents which are relevant to my opinions is as follows:

I. **Wezner employment history**

    A. Career agent with Hancock, registered representative with John Hancock ("JH")/Signator from 4.1994 – 12.31.96;

    B. Changed to Independent broker status with Hancock 1.1.1997, listing Haddonfield address (which was subsequently used as address for Bonk policies); thru Mark West PHILA General Agent #548;

    C. Maintained registered representative status with Signator as broker-dealer, and maintained servicing agent role on variable life policies from 1.1.1997 thru 2.26.1999;

        1.    Signator and Mark West as General Agent/Supervising Registered Representative responsible for rep supervision on

R. Karl Hill, Esquire
September 20, 2007
Page 2

securities business; variable life policies #20028718 (10.18.1998), #20014007 (9.23.1997) sold while under GA relationship and Registered Representative Status.

2.    Letter dated 1.9.2001 on JH General Agent stationary, under Wezner's signature, to JH home office, asking for suspension of conservation efforts on #20028718 which letter was accepted and placed in JH file.

3.    Rep submitted address changes on #20014007 on 10.23.1997 and 2.10.1988 listing his home address (on file with JH and Signator) as new owner address.

4.    9.29.1998 memo from D. Moon (JH Underwriter) to K. Pastella at JH General Agent office requesting trust verification; nothing in JH production indicates that an effort was made to secure actual trust (#20028718).

5.    Both policies sold while under JH/Registered representative contract status; both policies illustrated to lapse within 12-13 years, at 10% and 12% return assumptions (non-guaranteed), prior to life expectancy.

6.    #20014007: Change of ownership/beneficiary from ILIT to revocable trust (11.15.1997) and then to new ILIT (2.5.1998), followed by 2.10.1998 request to again change address to Haddonfield.

D. Terminated registered rep status with Signator on 2.26.1999.

E. Became full-time agent/registered representative with MetLife and MetLife Securities @3.1999 through 4.2005.

F. As MetLife agent and registered representative, sold various universal life policies to the Bonk's in 2002 and 2003.

1.    During this tenure, Wezner made various unauthorized transactions.

2.    Policies issued from MetLife were underfunded and projected to lapse, under current assumptions, within 7-8 years.

3.    Participated in fraudulent viatical settlement on the Lincoln and West Coast Life policies during employment with MetLife.

4.    Listed various addresses to conceal activities while employed at MetLife.

R. Karl Hill, Esquire
September 20, 2007
Page 3

II.   **John Hancock #20014007**

 A. Original application 4.17.1997 for $3M Survivorship Variable Life, to be owned by Irrevocable Trust of Patricia Bonk, U/A/D 6.28.1990, William Tappan, TTEE (Tax ID #51-6186351). Application signed in Pennsylvania but clients live Delaware and Trust is in Delaware.

 B. Agent requested face amount increase to $4M @4.30.1997; no record showing actual increase in effect.

 C. Revised application 9.23.1997 to increase face amount to $5M, assuming $246K Yr. 1 premium, $51K for 13 years thereafter, assuming 10% gross return policy lapsed @ year 12.

 D. Other dates

  1. 4.17.1997 – 7.16.1997: $195K premium received.

  2. 10.27.1997: change of address from K. Pastella to list 408 Merion Ave, Haddonfield NJ as address of record.

  3. Change of ownership/beneficiary from ILIT to revocable trust (11.15.1997_ and then to ILIT (2.5.1998), followed by 2.10.1998 request to again change address to Haddonfield.

  4. 9.22.1998 statement indicates total premiums paid @$341,500.; less @$126,000 charges.

  5. 12.30.1999: Surrender request payable to Trust Administrators, sent to NJ address; $316,488 sent on 1.3.2000.

  6. Need total premiums paid (cost basis), surrender charges imposed.

III.  **John Hancock #20028718**

 A. Original application for $2M Survivorship Variable Life, issued 10/8/1998, under Harry and Patricia Bonk Irrevocable Trust U/A/D 2.5.1998, Mark Bonk TTEE, with Haddonfield address.

 B. Indicates intention to replace CIGNA $2M policy

 C. Application signed in DE, but owner address is NJ.

 D. Illustration assumes $120,604 Yr. 1, $26k years 2-14, at 12% gross return policy lapses in year 12-13.

 E. Other Dates

R. Karl Hill, Esquire
September 20, 2007
Page 4

1.   9.29.1998 memo from D. Moon (JH Underwriter) to K. Pastella at JH General Agent office requesting trust verification; nothing in JH production indicates that an effort was made to secure actual trust.

2.   Letter dated 1.9.2001 on JH General Agent stationery, under Wezner's signature, to JH home office, asking for suspension of conservation efforts on #20028718

3.   1.7.2001 surrender check sent to Trust Administrators, Ambler PA.

4.   Total premiums paid (cost basis), and surrender charges imposed.

IV.   Lincoln National Life #7100468

A. Issued 2.14.2000 as replacement of $5M Hancock #20014007

B. $6,000,000 face amount

C. Owned/payable to ILIT U/A/D 2.5.1998

D. Target premium of $372,000 per year referenced on application

E. $316,488 paid on 1.2000 to Trust Administrators from surrender value of Hancock policy.

F. 6.2002: Lincoln policy subsequently sold to AllSettled/Consolidated Funding, without clients knowledge, for $110,000., which was fraudulently sent to address in Ambler, PA

V.   MetLife #6704399

A. Issued 5.9.2002 for $3M Survivorship Universal Life, owned/payable to the ILIT dated 2.5.1998

B. Application references P.O. Box 869, Ambler PA as address of record

C. Premium applied for of $149,999 year 1, $19,995 semi-annually Yr. 2+

D. Illustration submitted to Metlife with application indicated policy would lapse, under current assumptions (as of 5.2002) in 8-9 years, well below what was communicated to insured and trustee

E. MetLife indicates policy premium paid on 5.22.2002 via 1035 exchange of $130,015 but application processed by MetLife does not

R. Karl Hill, Esquire
September 20, 2007
Page 5

include an exchange form, and does not indicate replacement of prior coverage

F. Does not appear that MetLife requested trust verification or copy of ILIT to confirm authorized persons

G. Policy signed in Rehoboth Beach, DE but lists Ambler, PA as address

H. Check from Trust Administrators, dated 6.13.2002 from PNC Bank (#1034) applied to premium

I. Policy is underfunded to accomplish stated goals, and premium of $113,040 annually is required to maintain policy

J. Another MetLife agent, Radley Spring, is listed as agent for 6.1% of the commission; possibly he had access to confidential financial and medical information without knowledge or authorization from the Bonks.

VI. MetLife #6720566

A. Issued 7.5.2003 for $4M Survivorship Universal Life, owned/payable by ILIT dated 2.5.1998

B. Application references P.O. Box 869, Ambler PA as address of record

C. Premium applied for of $282,874 year 1, $32,874 annually Yr. 2-8.

D. Illustration submitted to MetLife with application indicates policy would lapse, under current assumptions (as of 7.2003) in 7-8 years, well below what was communicated to insured and trustee

E. MetLife indicates policy premium paid on 7.15.2003 via 1035 exchange of $250,000, but application processed by MetLife does not include an exchange form, and does not indicate replacement of prior coverage

F. Does not appear that MetLife requested trust verification or copy of ILIT to confirm authorized persons

G. Policy signed in Rehoboth Beach, DE but lists Ambler, PA as address

H. Unable to explain why prior policy was not increased (instead of issuing new policy)

I. Policy is underfunded, need @$117,000 annually to maintain policy

R. Karl Hill, Esquire
September 20, 2007
Page 6

VII.   MetLife #6706592

    A. Issued 9.11.2002 as single life on Patricia Bonk

    B. Premium of $68,000 paid on 9.17.2002

    C. Policy lapsed 10.2.2003

    D. Bonks do not recall applying/paying for single life policy; appears premium came from settlement of Lincoln National Policy

    E. No documents in file; only referenced in response to complaint

VIII.  West Coast Life #Z6A3743355

    A. Referenced in complaint and file

    B. Various premiums paid from trust as per spreadsheet from Mark Bonk

    C. Policy appears to have been settled/sold to AllSettled/Aspen Trust @7.7.2003, but no reference in file to amount paid (may be reflected in the $110,000 referenced under IV above)

IX.   CIGNA #7029548

    A. File indicates $2M policy issued 5.10.1996

    B. Appears to be surrendered/lapsed but nothing in file with any details

    C. Awaiting information requested by Mark Bonk after CIGNA rejected request from Mr. and Mrs. Bonk

**SUMMARY and ANALYSIS:**

After consulting with estate planners, the Bonks established various trusts which were to own these life insurance policies to accomplish stated estate planning goals.

In 4.1997-9.1997, and again 10.1998, Richard Wezner (agent), in his capacity as agent under the John Hancock General Agent (PHILA-Mark West), and as Registered Representative through John Hancock Distributors, Inc. (later known as Signator Investors, Inc.), John Hancock's broker/dealer, sold two (2) variable survivorship life policies, insuring Harry and Patricia Bonk, for a total of $7M, issued by John Hancock. During the agent's tenure with Hancock, as agent and registered representative, various activities occurred that subsequently resulted in negative financial consequences to the Bonks and the trusts owning the policies,

R. Karl Hill, Esquire
September 20, 2007
Page 7

which in my opinion renders John Hancock and MetLife both liable in this case. Among them:

1. **Suitability of variable life policies originally sold:** Both policies were sold assuming aggressive rates of return of 10% and 12%, and based upon even these aggressive assumptions, and projected premiums (as stated on the original illustration and applications) of (collectively) $376,000 year 1, and $76,000 annually thereafter, policies would lapse only after @12 years, or @ age 84-85. Standard practices would typically suggest that funding be adequate to ensure coverage can remain in-force until age 90 or longer, and less aggressive assumptions made to ensure adequate premium levels are maintained. Furthermore, such aggressive return assumptions would have required a commitment to a very aggressive asset allocation model of almost all equity investments within the separate accounts of the policies. The general agent and Signator supervisory representative, and/or compliance should have questioned the suitability and appropriateness of proposed transactions.

2. **Change of address from original owner to agent's address of record:** A clear sign of fraud should have been detected when the agent and general agent (via Kim Pastella, of PHILA Mark West) submitted a request to change the address of record to agent's stated residence, without permission from trustee Mark Bonk. In 1997, when submitting forms to become appointed and registered with Hancock and Signator, agent referenced 408 Merion Ave., Haddonfield NJ as his primary address, which was subsequently used in a 10.27.1997 memo to Hancock as the new address of record for one of the policies. This same address was also used in a similar request dated 2.10.1988. These activities occurred during agent's tenure with Hancock as agent, and Signator as registered representative, and call into question standard procedures and supervisory practices of Hancock, the general agent, and Signator.

3. **General Agent and its staff:** Disregarded standard procedures, never fulfilled underwriting request to verify trust information, which more than likely would have prevented the fraudulent transactions. Processed change of address to agent's home address. Provided policy information to agent even after termination of employment and termination of independent status. Accepted letter on general agent stationery, under agent's signature, suspending any conservation efforts, well after termination of any relationship between Hancock and agent.

Within several months after resigning from Hancock, and while employed at MetLife, agent approached Bonks suggesting a replacement of Hancock #2004007, @1.2000, with a new policy from Lincoln National. Concurrent with the Lincoln National application, agent sent surrender request using fraudulent NJ address to receive surrender value of @$316,000 from Hancock. (There was also a $4M West Coast Life policy issued, but need to verify dates. This policy was subsequently sold

R. Karl Hill, Esquire
September 20, 2007
Page 8

without client knowledge in 7.2003.) In 1.2001, while employed at MetLife, agent induced clients to surrender the other Hancock policy, resulting in a payment of @$91,000, which was sent to Trust Administrators, Ambler, PA. At the same time, agent was communicating to Hancock as agent of record. The surrender of both Hancock policies, only several years old at the time of surrender, likely resulted in significant surrender charges, estimated at @$100,000. (A complete audit of both policies would indicate total premiums paid, and surrender charge imposed.) At the end of these transactions, the clients were told there was a total $10M face amount in force.

In 5.2002, while still employed at MetLife, agent induced clients to purchase another policy for $3M, issued by MetLife. Concurrently, agent was arranging, without owner's knowledge or consent, a life settlement/policy sale of the Lincoln National policy, which was subsequently settled for $110,000 in 6.2002. In both transactions, agent used a post office box, without client knowledge or consent, to facilitate the fraudulent transactions.

In 9.2002, agent, while still employed with MetLife, arranged for the issue of a $1.5M policy, issued on the life of Mrs. Bonk, without her knowledge and consent. A payment of $68,000, using funds obtained as a result of the fraudulent transactions, was used to make a single premium payment. As the Bonk's were not aware of this policy, the policy lapsed in 10.2003 for non-payment.

In 7.2003, agent induced clients to purchase an additional $4M from MetLife, under almost identical fact pattern as prior sale. Concurrently, agent was arranging for a life settlement/policy sale of the West Coast Life policy, without client knowledge or consent. On 7.7.2003, AllSettled/Aspen Trust received ownership of the West Coast policy. As a result of these transactions, face amount was reduced from a total $10M to $7M, and cash value inside both policies transferred as a result of the unauthorized policy sale to AllSettled, without adequate compensation to the trust and/or the trust beneficiaries.

As a result of the various transactions, the Bonks and the ILIT they established have suffered significant financial losses, which can be attributed to the various parties involved in the transactions referenced.

**Hancock/Signator/Mark West**: In sum, following are areas wherein Hancock breached the standard of care.

1.    Failure to supervise activities of agent while in capacity of agent and registered representative.

2.    Issuing variable life policies with aggressive assumptions and inadequate premium levels to fund policies to stated goals.

R. Karl Hill, Esquire
September 20, 2007
Page 9

3.   Lack of trust verification, despite internal request.

4.   Inadequate procedures to allow agent to continually change address of record to agent's personal residence and other addresses used by agent to hide fraudulent activities.

5.   Acceptance of instructions from agent no longer authorized to act on behalf of company.

6.   Processing of surrender requests resulted in surrender charges of approx. $100,000.

In addition, John Hancock should be responsible for the errors and omissions of Richard Wezner.

MetLife: In sum, following are areas wherein MetLife breached the standard of care.

1.   Failure to supervise activities of agent/registered representative while employed, including transactions with outside companies (Lincoln and West Coast Life)

2.   Issuing life policies with assumptions that would result in policies lapsing 7-8 years; allowing use of unapproved and misleading sales and marketing materials, used to induce clients to replace prior coverage.

3.   Lack of trust verification

4.   Processing of premium payments from third parties not affiliated with trust/owner

5.   Inadequate procedures to allow agent to change address of record to addresses used by agent to hide fraudulent activities.

6.   Allowing registered representative to participate in life settlement can be considered a private securities transaction, subject to supervision of MetLife Securities.

7.   MetLife is responsible for the errors and omissions of Mr. Wezner.

The Bonk's should be entitled to $68,000 premium paid on single life policy on Mrs. Bonk, lapsed in 1 year with no surrender value (Plaintiffs have no knowledge of this policy and were never informed of its existence.) The Bonks should be entitled to restoration of face amount reduction (adjust face amount to

R. Karl Hill, Esquire
September 20, 2007
Page 10

$10M, restoring the original face amount) which occurred as a result of the various replacement transactions. The Bonks should be entitled to elimination of premiums needed to fund the current (and restored) face amount in force, to allow coverage to remain in force through death of second insured.

### Wezner:

My opinion is that Mr. Wezner allegedly and improperly advised and represented the Bonks in connection with life insurance. The Bonk's have been damaged by Wezner's conduct and those damages should include:

1.    Any proceeds collected from AllSettled (settlement amount, commissions/fees, etc.) for unauthorized sale of Lincoln and West Coast Life policies.

2.    Recovery of commissions earned from Hancock, MetLife, Lincoln and West Coast due to excessive replacements and churning activity.

3.    Recovery of surrender values sent to Wezner (approx. $400,000 from Hancock) which were used for his own benefit.

4.    Estimated commissions paid to Wezner, based upon target premiums listed in policy specification pages. Most life policies pay a commission based upon target premium received in the first policy year. Typical commission rates are 50-100% of such premium, up to the stated target premium of the policy. In addition, the general agent would have received an override, typically of 10-20% of such premium. Actual commission paid to the agent and/or general agent would have been based on other factors, such as a negotiated payout rate, production levels, bonus payouts, etc. Based upon this, a reasonable estimate that the agent, Wezner, would have been paid at a rate of 75% of any first year premium received. Premiums listed below were referenced on the various illustrations and applications, but only MetLife provided actual confirmation of premiums received. Assuming premiums for the Hancock and Lincoln National policies referenced on their respective applications and/or illustrations were actually received, the following is a reasonable estimate of commissions paid to Wezner.

R. Karl Hill, Esquire
September 20, 2007
Page 11

| Company | Policy# | Year 1 Prem. | First Year Commission (75%) |
|---|---|---|---|
| John Hancock | #20014007 | $246,000 | $184,500 |
| John Hancock | #20028718 | $146,000 | $109,500 |
| Lincoln National | #7100468 | $316,488 | $237,366 |
| MetLife | #6720566 | $250,000 | $187,500 |
| MetLife | #6704399 | $149,900 | $112,425 |
| MetLife | #6706592 | $ 68,000 | $ 51,000 |
| | T | TOTAL: | $882,291 |

In conclusion it is my opinion that John Hancock, Met Life, and Richard Wezner are all legally liable for damages to the Bonks and the irrevocable trust.

Raymond N. Ianni
CFP®. ChFC

Enclosure:  Curriculum Vitae

Princor Registered Representative ♦ Financial Advisor ♦ Financial Representative, Principal Life Insurance Company
Offices in
Pennsylvania ♦ New Jersey ♦ Delaware ♦ Maryland

Insurance issued by Principal Life Insurance Company and the companies available through the Preferred Product Network, Inc. Securities and advisory products offered through Princor Financial Services Corporation, 800/247-4123, member SIPC. Principal Life, the Preferred Product Network and Princor® are members of the Principal Financial Group®, Des Moines, IA 50392. DVFG Advisors, LLC is not an affiliate of any company of the Principal Financial Group.

# EXHIBIT B

Metropolitan Life Insurance Company
1 MetLife Plaza
27-01 Queens Plaza North, Area 5A
Long Island City, NY 11101

**MetLife®**

**VIA FEDERAL EXPRESS**

December 15, 2005

Ms. Melita M. Saunders-Tiernan
Compliance Specialist
NASD
Philadelphia District Office
1835 Market Street, Suite 1900
Philadelphia, PA 19103-2929

Re:    Examination #2005 001 9234
       Metropolitan Life Insurance Company ("MLIC")
       Registered Representative:  Richard S. Wezner

Dear Ms. Saunders-Tiernan:

This responds to the NASD's November 25, 2005 inquiry letter requesting additional information regarding allegations that were disclosed on Form U-5, which Metropolitan Life Insurance Company ("MetLife") amended and filed for Richard S Wezner ("Wezner") in June 2005.  A copy of your letter is attached.

MetLife considers this response and the attachments to be confidential documents. MLIC requests for these confidential documents, and particularly any privileged documents, to be protected by a heightened confidentiality/security and not be subject to disclosure.  MLIC is only providing this documentation pursuant to regulatory requirements as outlined in NASD Procedural Rules 8210 and 8220 regarding NASD investigations.  By providing this documentation, MLIC does not waive its confidentiality or privilege with regard to these documents.  This letter includes information MLIC believes to be accurate and complete to the best of our knowledge and records.

The following is in the order as set forth in your request:

1.  When did MetLife decide to investigate Wezner's application for a $30 million life insurance policy?  **August 2004.**

2.  How, when and from whom did MetLife learn that Wezner was a licensed third-party administrator?  **Richard Wezner's manager, Nicholas Mingone, was aware in the summer of 2004 that Wezner was acting as a third-party administrator.  In January 2005, during an interview of Richard Wezner, management learned that Wezner was a licensed third-party administrator.**

**CONFIDENTIAL**

Ms. Melita M. Saunders-Tiernan
December 15, 2005
Page 2

3. Would MetLife have approved Wezner's request to become a licensed third-party administrator? Submit supporting documents and explain how the firm would have supervised this activity. **Because this questions calls for speculation without any facts, the company is unable to answer whether it would have approved the request.**

4. Did MetLife at anytime approve Wezner's request to become a licensed third-party administrator? If so, submit documents that evidence the firm's approval. If not, submit documents that reflect the firm's disapproval. **Wezner filed an outside business activity form with the company concerning his work as a third party administrator and the company did not object to it. See Exhibit #1 for a copy of the OBA Form.**

5. When did MetLife interview ? **December 8, 2004.**

6. When did MetLife interview  and ? **December 15, 2004**

7. Did Wezner ever submit to MetLife copies of his bank statements, canceled checks and other documents related to his third-party administrator firms? **No**

8. Review the highlighted area of an enclosed excerpt from MetLife's May 27, 2005 investigative report. Please explain what that paragraph means and provide supporting documents. Provide a copy of the release referred to in that paragraph. **In November 2003, the Company issued a Field Release restricting the submission of third-party payments. We did receive limited third-party payments after the 11/03 Field Release for some of Wezner's clients, however, the remittances were allowed because the explanation for the payments was acceptable per the enhanced remittance guidelines (i.e. - remittances from employers). See Exhibit #2 for a copy of the Field Release.**

If you have any questions, please call me at 212-578-5309 or by email at elawrence@metlife.com.

Sincerely,

Evett Lawrence
Investment Compliance Consultant

REDACTED
CONFIDENTIAL
POLICYHOLDER
INFORMATION

Attachment(s)

CONFIDENTIAL

CONFIDENTIAL

MP285500001290

November 25, 2005

**NASD**

VIA FACSIMILE AND REGULAR MAIL

Eileen Frederickson, Director
Metropolitan Life Insurance Company
200 Park Avenue
New York, NY 10166

Re:     Matter No. 20050019234
        Registered Representative: Richard S. Wezner

Dear Ms. Frederickson:

This office has been conducting an inquiry into allegations that were disclosed on Form U-5, which Metropolitan Life Insurance Company ("MetLife") amended and filed for Richard S. Wezner ("Wezner") in June 2005. The filing states that Wezner:

➢ Commingled client funds
➢ Maintained address control over customer contracts
➢ Altered company records regarding an ownership change request
➢ Engaged in unreported outside business activities
➢ Sold customer policies to life settlement companies

Be advised that the inquiry remains in progress. Accordingly, please answer the following questions and provide clear and legible documents on or before December 13, 2005:

1. When did MetLife decide to investigate Wezner's application for a $30million life insurance policy? According to the firm's February 11, 2005 investigative report, Wezner applied for this policy in February 2004, but it lapsed in July 2004. The report also stated that Wezner had neither repaid the expense allowance nor the commission he received as a result of this insurance policy sale.

2. How, when and from whom did MetLife learn that Wezner was a licensed third-party administrator? Provide a detailed response and supporting documents.

3. Would MetLife have approved Wezner's request to become a licensed third-party administrator? Submit supporting documents and explain how the firm would have supervised this activity.

4. Did MetLife at anytime approve Wezner's request to become a licensed third-party administrator? If so, submit documents that evidence the firm's approval. If not, submit documents that reflect the firm's disapproval.

**CONFIDENTIAL**

Philadelphia District Office
1835 Market Street
Suite 1900
Philadelphia, PA
19103-2929

tel 215 665 1180
fax 215 496 0434
www.nasd.com

Investor protection.  Market Integrity.

Eileen Frederickson, Director
20050019234
November 25, 2005
Page 2

5.  When did MetLife interview ███████? According to MetLife's May 27, 2005 investigative report, during that interview, ██████ informed the firm's investigators that Wezner instructed him in August 2002 to issue life insurance premium checks to his third-party administrator companies.

6.  When did MetLife interview ██████ and ████████? Reference is made to an interview or interviews of these customers in MetLife's May 27, 2005 investigative report.

7.  Did Wezner ever submit to MetLife copies of his bank statements, canceled checks and other documents related to his third-party administrator firms? If so, supply copies of those documents in *.*pdf (Adobe Acrobat) format or some other electronic format via compact disk or electronic mail. My electronic mail address is: Melita.saunders-tiernan@nasd.com.

8.  Review the highlighted area of an enclosed excerpt from MetLife's May 27, 2005 investigative report. Please explain what that paragraph means and provide supporting documents. Provide a copy of the release referred to in that paragraph.

This request is made pursuant to NASD Rule 8210, which requires member firms and persons associated (or formerly associated) with member firms to provide information with respect to any matter involved in an investigation, complaint, or proceeding. Please be advised that the failure to comply with this request may subject Metropolitan Life Insurance Company to disciplinary action.

**Since this is a preliminary inquiry, it does not require reporting under Form U-4, Question 14G, regarding notice of investigations. Please be reminded, however, that it is important for your firm to determine whether the content of the customer complaint requires disclosure through either Form U-4 or Form U-5, or as an event or statistical report to the NASD pursuant to Rule 3070.**

Sincerely,

*Melita A Saunders-Tiernan*

Melita M. Saunders-Tiernan
Compliance Specialist

REDACTED
CONFIDENTIAL
POLICYHOLDER
INFORMATION

Enclosure

CONFIDENTIAL

INVESTIGATION DETAILS

The extent of Mr. Wezner's activities relative to the issues cited in this report is limited to, in general, one family group ▮▮▮▮, who cooperated during our investigation.  While we identified additional concerns involving several other of Mr. Wezner's clients, they were either reluctant to provide information, or ignored multiple contact requests by Internal Audit.

In addition, several of the items in this report are specific to transactions Mr. Wezner handled for clients at other carriers, *after* his last day of work, June 29, 2004 and effective disability date of July 26, 2004.

1. <u>COMMINGLING OF POLICYHOLDER FUNDS:</u>

FSR Wezner disregarded Company Guidelines and NASD\SEC Rules by commingling client funds, running both client premium payments and related policy disbursements through three bank accounts under his control.  Mr. Wezner facilitated this activity by having customer policies issued with Post Office Box addresses of record that were under his control, and by directing clients to make premiums payable to Third-Party Administrator (TPA) accounts under his control.  In total, premiums for eight insureds were received from Mr. Wezner's TPA accounts.  While we did see limited third-party payment activity after the company changed in company procedure in regards to remittances, the remittances were accompanied by explanations per the enhanced guidelines.

A review of Mr. Wezner's premium remittance activity indicated that during the period February 25, 2002 to June 3, 2004, he submitted 29 checks totaling $945,335 from bank accounts in the names of United Group Programs, Medical Benefits Administrators, and Trust Administrators, each having a different mailing address.  Review of external database sources confirmed Mr. Wezner is a principal of each of these businesses.  Mr. Wezner also submitted Cashier's Checks from FNC Bank totaling $298,342 during this time; however, the checks do not identify the bank account number of the purchaser.  These payments paid premiums on multiple policies issued by MetLife, GenAm or NEF to eight different insureds (Exhibit 1).  The billing address on MetLife records for these insureds were the Post Office Boxes under Mr. Wezner's control.

Based on interviews with customer ▮▮▮▮▮▮, Mr. Wezner, beginning with the August 7, 2002 billing period, instructed Mr. Smith to make premium payments checks payable to either Trust Administrators or United Group Programs, and mail the checks directly to addresses under Mr. Wezner's control (Exhibit 2).

An analysis of Mr. ▮▮▮ payment records and MetLife's policy disbursement and premium remittance records indicates that Mr. ▮▮▮ should have received premium credits totaling $1,137,250 (Exhibit 3).  This total consists of checks written on Mr. ▮▮▮ business account ($468,461), MetLife policy disbursements payable to the ▮▮▮ ($163,789), John Hancock checks payable to Mr. ▮▮▮ ($195,000) and a Life Settlement check payable to ▮▮▮ ($310,000).  However, during the period March 1999 to January 2005, we could only verify that $789,179 was credited to policies written by Mr. Wezner with MetLife, NEF, GenAm, MassMutal, Transamerica and AIG (Exhibit 4), creating a current deficiency totaling $348,071 (based on available records).

METLIFE CONFIDENTIAL<br>Page 3

REDACTED
CONFIDENTIAL
POLICYHOLDER
INFORMATION

**CONFIDENTIAL**

Deleted: Should we say they came from his bank account?

# EXHIBIT C

Westlaw.

Not Reported in A.2d

Not Reported in A.2d, 2007 WL 2758775 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 1

Island Farm, Inc. v. Master Sidlow & Associates,
P.A.
Del.Super.,2007.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
  Superior Court of Delaware,New Castle County.
     The ISLAND FARM, INC., a Delaware
         Corporation, Plaintiff,
                  v.
    MASTER SIDLOW & ASSOCIATES, P.A., a
   Delaware Professional Corporation, Defendant.
            No. 06C-03-206PLA.

           Submitted: Aug. 6, 2007.
           Decided: Sept. 20, 2007.

   ON DEFENDANT'S MOTION FOR SUMMARY
                JUDGMENT
PEGGY L. ABLEMAN, Judge.
*1 This 20th day of September, 2007, upon
consideration of the Motion for Summary Judgment
filed by Defendant Master Sidlow & Associates,
P.A. ("Master Sidlow"), it appears to the Court that:

1. In 1998, The Island Farm, Inc. ("Island Farm")
sold a Preservation Easement on approximately
1,073 acres of land in Delaware to the Delaware
Agricultural Lands Preservation Foundation ("
DALPF"). The sale closed on July 28, 1998. On the
Settlement Statement, the "Contract Sale Price" was
$1,717,366.28. Deducted from that amount was
$686,946.51 which represented a "donation." FN1

       FN1.Docket 28, ¶ 1.

2. Master Sidlow prepared Island Farm's 1998
Federal Tax Return. On the Tax Return, Master
Sidlow reported the "donation" to DALPF correctly
in the amount of $686,949.51. The Tax Return also
reported the "sale price" of $1,717,366.28 as the

amount received by Island Farm for the sale. In
reality, however, Island Farm only received
$1,030,400.80 from DALPF, which was the amount
reflected on the Settlement Statement.FN2

       FN2.Id., ¶ 2.

3. I.R.S. Reg. § 1.1011-2(c)FN3 permits a reduction
of the basis of land sold for discounted price, also
called a "bargain sale," to a charitable organization,
such as DALPF. Because Master Sidlow failed to
apply for the allowable reduction under §
1.1011-2(c) and failed to include the proper sale
price, Master Sidlow miscalculated Island Farm's
Federal taxes by approximately $233,566.00. Island
Farm also overpaid its Delaware taxes by a similar
amount.

       FN3.26 C.F.R. § 1.1011-2(c).

4. In 2001, Island Farm terminated its relationship
with Master Sidlow and retained the accounting
firm of Jefferson, Urian, Doane & Sterner ("
Jefferson Urian"). While conducting an audit of
Island Farm for the year 2005, Jay Stevens, an
accountant with Jefferson Urian, discovered the
1998 tax return error. He advised Island Farm of the
error on May 18, 2005.FN4

       FN4.Docket 28, ¶ 3.

5. Island Farm filed its complaint against Master
Sidlow on March 20, 2006 alleging that Master
Sidlow negligently prepared its 1998 federal and
state tax returns that were filed in October, 1999. FN5

       FN5.Docket 25, ¶ 1.

6. Master Sidlow has filed the instant Motion for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2007 WL 2758775 (Del.Super.)
(Cite as: Not Reported in A.2d)

Summary Judgment arguing that Island Farm's complaint should be dismissed because the three year statute of limitations under 10 *Del. C.* § 8106 has run.[FN6]Master Sidlow contends that the rule of discovery is inapplicable in this case because Board members of Island Farm knew of the error as early as 1998. To support this claim, Master Sidlow argues that the Island Farm Board directed two accountants, Scott Rothenberger and Eugene Dvornick, to inquire into the sale of the preservation easement that was sold at a discount.[FN7] Master Sidlow also submits that Rothenberger used the term "bargain sale" at the same meeting, thereby placing the Board on inquiry notice.[FN8] Finally, Master Sidlow identifies an email sent by Mr. Dvornick to other Master Sidlow accountants involved with the Island Farm account that indicates that Mr. Dvornick questioned whether the DALPF sale was treated appropriately for tax purposes.[FN9]

FN6.Section 8106 states, in pertinent part:
No action ... to recover damages caused by an injury unaccompanied with force or resulting indirectly from the act of the defendant shall be brought after the expiration of three years from the accruing of the cause of such action....
10 *Del. C.* § 8106.

FN7.Docket 25, ¶ 5; *Id.,* Ex. A.

FN8.*Id.,* ¶ 7-8.

FN9.Docket 28, ¶ 12; *Id.,* Ex. I.

**\*2** 7. In response, Island Farm argues that, under the discovery rule, the statute of limitations was tolled until 2005, since Island Farm could not have known of the error until that time. Hence, it argues that this suit is timely. Specifically, Island Farm notes that Mr. Dvornick, an Island Farm accountant, has no recollection of using the term "bargain sale" and would have referred any tax matters to Master Sidlow.[FN10]Moreover, Island Farm notes that the email made no mention of a "bargain sale," and Mr. Dvornick had no recollection of anything other than what was stated in that email.[FN11]Island Farms also points out that deposition testimony of Island

Farm board members suggests that they would not have understood the term "bargain sale" in this context and would have relied upon Master Sidlow's expertise in tax matters. As a result, Island Farm submits that there was nothing that would have alerted them to the 1998 error.

FN10.Docket 28, ¶ 11. Master Sidlow agrees that Mr. Dvornick had no recollection of the meeting. *See*Docket 25, ¶ 6.

FN11.*Id.,* ¶ 12.

8. When considering a motion for summary judgment, the Court's function is to examine the record to ascertain whether genuine issues of material fact exist and to determine whether the moving party is entitled to judgment as a matter of law.[FN12]The court must "view the evidence in the light most favorable to the non-moving party."[FN13] "The moving party bears the initial burden of demonstrating that the undisputed facts support his legal claims."[FN14]If the proponent properly supports his claims, the burden "shifts to the non-moving party to demonstrate that there are material issues of fact for resolution by the ultimate fact-finder."[FN15]Summary judgment will not be granted if, after viewing the record in a light most favorable to the nonmoving party, there are material facts in dispute or if judgment as a matter of law is not appropriate.[FN16]If, however, the record reveals that there are no material facts in dispute and judgment as a matter of law is appropriate, then summary judgment will be granted.[FN17]

FN12.Super Ct. Civ. R. 56(c).

FN13.*Storm v. NSL Rockland Place, LLC,* 898 A.2d 874, 880 (Del.Super.Ct.2005).

FN14.*Id.* at 879.

FN15.*Id.* at 880.

FN16.*Id.* at 879.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 3

Not Reported in A.2d, 2007 WL 2758775 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

FN17.*Id.*

9. A cause of action in Delaware begins to accrue under Section 8106"at the time of the wrongful act, even if the plaintiff is ignorant of [it]."[FN18] The limitations period, however, may be tolled in certain instances under the discovery rule.[FN19]In this case, the alleged wrongful act occurred in 1998, and Island Farm filed its complaint after the three year statute of limitations had expired.[FN20]Thus, Island Farm may only maintain this suit if the statute was tolled under the discovery rule.

> FN18.*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,* 860 A.2d 312, 319 (Del.2004).

> FN19.*Id.*

> FN20. Both parties agree that 10 *Del. C.* § 8106 is the applicable statute of limitations statute.

10. The discovery rule permits the Court to toll the statute where there is evidence of concealment or fraud, or where the injury is "inherently unknowable and the claimant is blamelessly ignorant of the wrongful act and the injury complained of."[FN21]Where a party presents such evidence, the statute will run "only upon the discovery of facts 'constituting the basis of the cause of action *or* the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery' of such facts."[FN22]These facts must usually be observable or objective factors that would alert laymen to the problem.[FN23]The Court, however, must evaluate all of the facts before it applies the discovery rule.[FN24]

> FN21.*Wal-Mart Stores, Inc.,* 860 A.2d at 319.

> FN22.*Id.* (citing *Coleman v. Pricewaterhousecoopers, LLC,* 854 A.2d 838, 842 (Del.2004)).

> FN23.*Began v. Dixon,* 547 A.2d 620, 623

(Del.Super.Ct.1988).

> FN24.*Isaacson, Stolper & Co. v. Artisans' Sav. Bank,* 330 A.2d 130, 133-34 (Del.1974).

**\*3** 11. In similar circumstances involving a negligence action against an accountant, the Delaware Supreme Court in *Isaacson, Stolper & Co. v. Artisans' Savings Bank* applied the discovery rule, thereby tolling the limitations period under Section 8106. In that case, the plaintiff did not learn of a tax deficiency until the I.R.S. sent him a letter. [FN25]Though the discovery of the injury arose as a result of a client-taxing authority relationship, the Delaware Supreme Court accepted that the discovery rule could apply in a client-accountant relationship depending on the facts:

> FN25.*Id.*

On September 18, 1974 the New Mexico Court of Appeals in *Chisholm v. Scott,* 86 N.M. 707, 526 P.2d 1300 applied the 'time of discovery' rule to a malpractice case against an accountant. The Court stated that in the relationship of accountant and client the trust and confidence that client places in the professional person places him in a vulnerable position should that trust and confidence be misplaced.
Further the Court indicated that it is the policy of the law to encourage such trust and confidence, and likewise it is the duty of the law to protect the client from the negligent acts of the professional person. We agree in principle.[FN26]

> FN26.*Isaacson, Stolper & Co.,* 330 A.2d at 134 (citations omitted).

12. More recently, in *Coleman v. Pricewaterhousecoopers, LLC,*[FN27] the Delaware Supreme Court applied the discovery rule where the plaintiff learned of his accountant's negligence only after the statute of limitations expired. In *Coleman,* plaintiffs sold their company to Lason, Inc., who was ultimately unable to pay the full purchase price

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 4

Not Reported in A.2d, 2007 WL 2758775 (Del.Super.)
(Cite as: Not Reported in A.2d)

after it was discovered that Lason engaged in fraudulent accounting practices. Plaintiffs sued their accountant, Pricewaterhousecoopers, LLC ("PWC"), after the statute of limitations period, alleging that PWC negligently failed to discover Lason's fraudulent accounting practices, thereby causing the plaintiffs to lose money on the sale. The Delaware Supreme Court first noted the applicability of the discovery rule:

> FN27.854 A.2d 838 (Del.2004).

This Court has applied the above-described " discovery rule" in cases claiming accounting and attorney malpractice, because of the special character of the relationship between the professional and the client, and the inability of a layperson to detect the professional's negligence.... The professional nature of the relationship between PWC and the plaintiffs; the plaintiffs' inability to acquire by other means, information about the accounting treatment of Lason's financial statements upon which the plaintiffs relied when DIT [the plaintiffs' company] was acquired; and the need for persons in the plaintiffs' position to rely upon the accounting work performed by PWC, permit no other conclusion.[FN28]

> FN28.*Coleman,* 854 A.2d at 842 (citations omitted).

After establishing that the discovery rule applied, the Delaware Supreme Court reversed the Superior Court's grant of summary judgment, noting that whether the Court should apply the discovery rule could not be determined from the record:
First, it is unclear, as a factual matter, whether or not the 1999 e-mail should have aroused the plaintiffs' suspicions to a degree sufficient to impose upon the plaintiffs a duty of further inquiry. Second, it is impossible to determine from the present record whether a more diligent investigation, even if pursued, would have uncovered facts sufficient to enable the plaintiffs to discover the basis of their accounting malpractice claim.... Thus, there was no "red flag" that clearly and unmistakably would have led a prudent person

of ordinary intelligence to inquire whether PWC had negligently failed to determine that Lason's pre-acquisition accounting practices violated GAAP. ... Those facts alone preclude a determination *as a matter of law* that a more diligent inquiry by plaintiffs would have enabled them to uncover the irregularities between January 1999 and January 2002.[FN29]

> FN29.*Id.* at 842-43.

*4 13. After reviewing the record in this case, the Court similarly determines that there are material issues of fact precluding a finding that Island Farm's action is not subject to the discovery rule. As in *Coleman,* the record is unclear, as a factual matter, with respect to whether Rothenberger mentioned " bargain sale" at any Board Meeting or whether any Island Farm board member referred to the term in any email, thereby placing Island Farm on notice of the 1998 error. Though there was an email addressed to Island Farm from Mr. Dvornick asking about the tax consequences of the Preservation Easement sale, there was no mention of a "bargain sale" and no indication that any members of Island Farm knew what that term meant for tax purposes. [FN30]Since the Court cannot determine whether " bargain sale" was mentioned at a meeting and, if it was, whether the mention of the term should have put Island Farm on inquiry notice of the 1998 error, this case is not ripe for summary judgment.

> FN30. For example, Karla Draper testified that Island Farm relied on Master Sidlow's expertise: "I mean she [Nancy Blumberg] was our representation that we relied on heavily because we were not capable of it. Obviously none of us were CPAs. She was the CPA and she handled everything for us. "Docket 28, Ex. G, at 24:17-21.

14. The Court is unable to determine, as it was unable to do in *Coleman,* whether there was any " red flag" that should have alerted Island Farm as an ordinary prudent person to find the 1998 error had it engaged in a diligent inquiry at that time. Island

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2007 WL 2758775 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Farm appropriately relied upon Master Sidlow to determine the tax consequences without inquiring into the 1998 tax returns "because of the special character of the relationship between the professional and the client, and the inability of a layperson to detect the professional's negligence."[FN31]Here, Island Farm has offered evidence that members of Island Farm's board did not understand the "bargain sale" concept and relied upon Master Sidlow's expertise for all tax matters.[FN32]Thus, the Court cannot determine as a matter of law whether Island Farm would have discovered the 1998 error had it engaged in greater due diligence.

FN31.*Coleman,* 854 A.2d at 842.

FN32.Docket 28, Exs. C, D, E, F, G.

15. Because the record is unclear as to whether Island Farm knew that the sale to DALPF constituted the "bargain sale," whether Island Farm understood the meaning of a "bargain sale" for tax purposes, or whether the use of that term would put an ordinary prudent businessperson on inquiry notice of the tax consequences of that term, the Court cannot determine as a matter of law whether the statute of limitations should be tolled in this case.

16. Based on all the foregoing, the Court finds that there is a genuine issue of material fact about whether Island Farm should have been alerted to the 1998 tax return error before the 2005 Jefferson Urian audit. The Court also finds that there is a genuine issue of material fact about whether Island Farm would have discovered the 1998 tax return error had it engaged in diligent inquiry. Accordingly, Defendant's Motion for Summary Judgment is **DENIED.**

**IT IS SO ORDERED.**

Del.Super.,2007.
Island Farm, Inc. v. Master Sidlow & Associates, P.A.
Not Reported in A.2d, 2007 WL 2758775 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

Westlaw.

Not Reported in A.2d                                                                    Page 1

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

**H**
In re Dean Witter Partnership Litigation
Del.Ch.,1998.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
In re DEAN WITTER PARTNERSHIP
LITIGATION
**No. CIV. A. 14816.**

July 17, 1998.

Pamela S. Tikellis, Esquire, and Robert J. Kriner,
Jr., Esquire, of Chimicles, Jacobsen & Tikellis,
Wilmington, Delaware; of Counsel: Nicholas E.
Chimicles, Esquire, Denise Davis Schwartzman,
Esquire, Francis J. Farina, Esquire, and M.
Katherine Meermans, Esquire, of Chimicles,
Jacobsen & Tikellis, Haverford, Pennsylvania,
Attorneys for Plaintiffs.
Kenneth J. Nachbar, Esquire, of Morris, Nichols,
Arsht & Tunnell, Wilmington, Delaware; of
Counsel: Martin London, Esquire, Richard A. Rosen
, Esquire, Robert N. Kravitz, Esquire, and Tracy
Anbinder Baron, Esquire, of Paul, Weiss, Rifkind,
Wharton & Garrison, New York, New York,
Attorneys for Defendants.

MEMORANDUM OPINION
CHANDLER, Chancellor.
*1 Investors, owners of interests in numerous real
estate limited partnerships, seek an accounting and
damages from general partners and financial
advisors for breaches of the fiduciary duties of care,
loyalty and candor. Information available to the
investors long before these lawsuits were instituted
put the investors on notice of the wrongs about
which they now complain. Therefore, all of the
investors' claims are barred by operation of the
applicable statute of limitations.

I. BACKGROUND

This action is a consolidation of several actions
brought by plaintiff investors against defendants
Dean Witter, Discover & Co. ("Dean Witter
Discover"), Dean Witter Reynolds, Inc. ("Dean
Witter Reynolds"), Dean Witter Realty, Inc. ("Dean
Witter Realty") (collectively "Dean Witter"), the
managing and associate general partners of seven
Dean Witter real estate limited partnerships, and
Tempo-GP, Inc. ("Tempo-GP"), the general partner
of Dean Witter/Coldwell Banker Tax Exempt
Mortgage Fund, L.P. ("Tax Exempt Mortgage Fund
").[FN1]

> FN1. An Order of Consolidation dated
> August 16, 1996, consolidated three
> actions filed in the Court of Chancery-
> *Segel v. Dean Witter, Discover & Co.,*
> C.A. No. 14816 (filed Feb. 6, 1996);
> *Schectman v. Dean Witter, Discover & Co.,*
> C.A. No. 14829 (filed Feb. 9, 1996);
> *Dosky v. Dean Witter, Discover & Co.,*
> C.A. No. 14838 (filed Feb. 15, 1996)-and
> added to the consolidated action plaintiffs
> from two other suits, one pending in the
> Southern District of New York-*Grigsby v.
> Dean Witter Reynolds, Inc.,* S.D .N.Y.,
> No. 96 Civ. 4064(LAP) (originally filed
> Dec. 27, 1995)-and one pending in the
> District of Maryland-*Young v. Dean
> Witter, Discover & Co.,* C.A. No.
> H-96-1139 (D.Md.) (originally filed Feb.
> 6, 1996).*See* Order of Consolidation (Aug.
> 16, 1996) (Docket No. 9).

Plaintiffs are customers of Dean Witter Reynolds,
who between 1984 and 1989, purchased from Dean
Witter Reynolds units of the following limited
partnerships: Dean Witter Realty Income
Partnership I, L.P. ("Income I"); Dean Witter
Realty Income Partnership II, L.P. ("Income II");
Dean Witter Realty Yield Income Partnership III,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

L.P. ("Income III"); Dean Witter Realty Income Partnership IV, L.P. ("Income IV"); Dean Witter Realty Yield Plus, L.P. ("Yield Plus"); Dean Witter Realty Yield Plus II, L.P. ("Yield Plus II"); Dean Witter Realty Growth Properties, L.P. ("Growth Properties"); and Falcon Classic Cable Income Properties, L.P. ("Falcon Classic Cable").[FN2] With the exception of Falcon Classic Cable, each of these Partnerships is a wholly-owned direct or indirect subsidiary of Dean Witter and is organized in the State of Delaware.

> FN2. These limited partnerships will be referred to collectively as the "Partnerships." The Partnerships bearing the Dean Witter name, *i.e.,* all of the defendant partnerships except Falcon Classic Cable, will also be referred to as the "Proprietary Partnerships." All of the Proprietary Partnerships are real estate limited partnerships.

Defendant Dean Witter Discover, a Delaware corporation, is a publicly-held financial services company providing credit and investment products. Defendant Dean Witter Reynolds, a Delaware corporation, is a broker-dealer and member of the New York Stock Exchange and other major securities, futures and options exchanges in the United States. Dean Witter Reynolds operates the securities business of Dean Witter Discover and acted as the offeror and/or underwriter for the sale of the Partnerships to plaintiffs. Dean Witter Reynolds also organized the Proprietary Partnerships that it sold to plaintiffs and acted as the exclusive selling agent for Falcon Classic Cable, which it did not sponsor.

Defendant Dean Witter Realty, a Delaware corporation, is a wholly-owned subsidiary of Dean Witter Discover. Dean Witter Realty is responsible for the creation, marketing and oversight of the Proprietary Partnerships. It is also the parent of the Delaware corporate subsidiaries formed to serve as the managing general partners of the Proprietary Partnerships. These corporate subsidiaries are, in turn, the general partners of the Delaware limited partnerships or corporations formed to serve as the

associate general partners of the Proprietary Partnerships.[FN3] Officers and employees of Dean Witter Realty served as officers and employees of these general partners. Dean Witter Realty was in charge of the day-to-day operations of each of the general partners of the Proprietary Partnerships.

> FN3. Managing and associate general partners will be referred to collectively as the "general partners."

**\*2** Defendants Dean Witter Realty Income Properties I Inc. and Dean Witter Realty Income Associates I, L.P. are the managing and associate general partners, respectively, of Income I. Defendants Dean Witter Realty Income Properties II Inc. and Dean Witter Realty Income Associates II, L.P. are the managing and associate general partners, respectively, of Income II. Defendants Dean Witter Realty Income Properties III Inc. and Dean Witter Realty Income Associates III, L.P. are the managing and associate general partners, respectively, of Income III. Defendants Dean Witter Realty Fourth Income Properties Inc. and Dean Witter Realty Income Associates IV, L.P. are the managing and associate general partners, respectively, of Income IV. Defendants Dean Witter Realty Yield Plus Inc. and Dean Witter Realty Yield Plus Associates, L.P. are the managing and associate general partners, respectively, of Yield Plus. Defendants Dean Witter Realty Yield Plus II Inc. and Dean Witter Realty Yield Plus Associates II, L.P. are the managing and associate general partners, respectively, of Yield Plus II. Defendants Dean Witter Realty Growth Properties Inc. and Dean Witter Realty Growth Associates, L.P. are the managing and associate general partners, respectively, of Growth Properties.

In addition, plaintiffs named as defendants Dean Witter Realty Income Associates I Inc. and Dean Witter Realty Income Associates II Inc.-the general partners of the associate general partners of Income I and Income II, respectively. Each of these defendant general partners is a Dean Witter affiliate, or wholly-owned direct or indirect subsidiary, organized in Delaware.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

Defendant Tempo-GP, a Delaware corporation, was originally owned jointly by a Dean Witter Discover subsidiary and Coldwell Banker Commercial Group, Inc. Today, Tempo-GP is a wholly-owned subsidiary of Dean Witter Discover. Tempo-GP is the general partner of the Tax Exempt Mortgage Fund and directed and controlled its activities.[FN4]

> FN4. In their Amended Complaint, none of the plaintiffs claims to have purchased units of the Tax Exempt Mortgage Fund. As such, plaintiffs do not have standing to assert any claims with respect to that fund or its general partner, Tempo-GP. *See Alabama By-Products Corp. v. Cede & Co.*, Del.Supr., 657 A.2d 254, 264 (1995).

Plaintiffs purport to bring this action on behalf of all persons and entities who purchased units of the Partnerships sold by or through Dean Witter Reynolds or other selling agents affiliated with Dean Witter from 1984 through the present.[FN5] Plaintiffs allege that defendants breached their fiduciary duties in connection with the Partnerships organized, sold and operated by defendants, in which plaintiffs invested. Among other things, plaintiffs allege that defendants breached the duties of loyalty, candor and care they owed to plaintiffs as their fiduciaries. Plaintiffs complain that they relied-to their detriment-upon the good faith of defendants in their roles as fiduciaries, as general partners, financial advisors and agents, and as officers and directors of the general partners. According to plaintiffs, defendants' breaches have caused plaintiffs to suffer the losses of substantial portions of their investments and have failed to realize the income, liquidity and security in their investments as promised them by defendants.[FN6]

> FN5. First Consolidated and Amended Class Action Complaint ¶ 37 (Docket No. 10) [hereinafter *Complaint*]. All further references to "plaintiffs" shall include the named plaintiffs as well as the purported class of plaintiffs.

> FN6. Complaint ¶ 3.

*3 Plaintiffs assert that Dean Witter sold the Partnerships through uniform sales materials that promoted sale of the Partnerships at the expense of candor. Specifically, plaintiffs claim that defendants misrepresented or failed to disclose to them at the time of purchase the nature of the risks involved in investing in the Partnerships, that defendants misrepresented or failed to disclose the financial condition of the Partnerships in order to conceal losses, mismanagement, fraud and self-dealing, and that defendants misled plaintiffs into believing that Dean Witter was recommending and selecting investments that presented low risk and were suitable for retirement accounts.[FN7] Plaintiffs further allege that although Dean Witter represented to plaintiffs that it would maintain a relationship with the Partnerships and oversee their operation,[FN8] Dean Witter failed to supervise the Partnerships in the plaintiff investors' best interests.

> FN7. Pls.' Memo. in Opp. to Defs.' Motion to Dismiss at 6 (Docket No. 32) [hereinafter *Pls.' Memo. in Opposition*].

> FN8. Complaint ¶ 25.

Plaintiffs insist that defendants were instead engaging in a systematic scheme designed to organize, sell and operate high risk, speculative limited partnerships in order to enrich themselves at the expense of plaintiff investors. According to plaintiffs, once defendants obtained investment capital from plaintiffs, defendants used the capital to purchase underperforming or failing investments owned by Dean Witter affiliates or to refinance underperforming loans owed to Dean Witter affiliates. Plaintiffs further allege that defendants channeled Partnership funds into faltering projects owned by earlier-formed Partnerships, to create the illusion of financial health for those Partnerships and to aid in marketing new ones.[FN9]

> FN9. Pls.' Memo. in Opposition at 2.

Defendants filed a motion to dismiss on December 10, 1996.[FN10]The motion cites several grounds for dismissal, including: (1) that the claims are

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                      Page 4

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

time-barred; (2) that plaintiffs' allegations fail to state a claim; and (3) that plaintiffs have improperly brought this action as a direct, rather than derivative, action. The parties briefed the motion, presented oral argument to the Court, and conducted a supplemental round of briefing specifically addressing the statute of limitations issue. As explained below, I agree with defendants that the applicable statute of limitations bars plaintiffs' claims.[FN11] Thus, plaintiffs' claims must be dismissed for failure to file within the statutory period.

> FN10. Defs.' Memo. in Support of Motion to Dismiss (Docket No. 21) [hereinafter *Defs.' Motion to Dismiss* ].

> FN11. Because I have determined that defendants' claim of time-bar is dispositive, I need not address the other grounds offered by defendants in their motion to dismiss.

## II. LEGAL STANDARD

There is clear legal precedent in Delaware for granting a motion to dismiss on the ground that a plaintiff's claims are barred by operation of the statute of limitations.[FN12]This is so even in equity. Although statutes of limitation do not generally apply directly in equity, equity follows the law and will apply a statute of limitations by analogy in appropriate circumstances.[FN13]Moreover, it is " well settled that where the complaint itself alleges facts that show that the complaint is filed too late, the matter may be raised by [a] motion to dismiss." [FN14]

> FN12.*Boeing Co. v. Shrontz,* Del. Ch., C.A. No. 11273, Berger, V . C. (Apr. 20, 1992) (dismissing breach of fiduciary duty claims on grounds of time-bar); *Halpern v. Barran,* Del. Ch., 313 A.2d 139 (1973) (same).

> FN13.*Kahn v. Seaboard Corp.,* Del. Ch., 625 A.2d 269, 271 (1993).*See also United*

*States Cellular Inv. Co. v. Bell Atlantic Mobile Sys., Inc.,* Del.Supr., 677 A.2d 497 (1996) ("Absent some unusual circumstances, a court of equity will deny a plaintiff relief when suit is brought after the analogous statutory period.").

> FN14.*Seaboard,* 625 A.2d at 277 (dismissing, with permission to replead, complaint in equity on statute of limitations grounds).

*\*4 In evaluating a motion to dismiss, I am required to assume the truthfulness of all well-pleaded (i.e., nonconclusory) allegations of the complaint for purposes of the motion.[FN15]I am also required to draw from the complaint all inferences or conclusions of fact that may reasonably be drawn from the specific facts alleged therein.[FN16] Conclusions asserted in the complaint, however, will only be accepted as true if there are specific allegations of fact to support them.[FN17]In the end, I may only dismiss the Amended Complaint if it is clear that plaintiffs will not be entitled to relief under any set of facts that could be proven based on the allegations of the complaint.[FN18]

> FN15.*Loudon v. Archer-Daniels-Midland Co.,* Del.Supr., C.A. No. 88, 1996, at 11-12, Veasey, C.J. (Sept. 17, 1997) (en banc); *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 & n. 6 (1988).

> FN16.*Id.*

> FN17.*In re Santa Fe Pac. Shareholders Litig.,* Del.Supr., 669 A.2d 59, 65-66 (1995); *Grobow,* 539 A.2d at 187 & n. 6.

> FN18. Ct. Ch. R. 12(b)(6); *Rabkin v. Philip A. Hunt Chem. Corp.,* Del.Supr., 498 A.2d 1099, 1105 (1985); *Litman v. Prudential-Bache Properties, Inc.,* Del. Ch., C.A. No. 12137, at 4-5, Chandler, V.C. (Jan. 14, 1994), *aff'd,*Del.Supr., 642 A.2d 837 (1994).
> Plaintiffs cite *Snyder v. Butcher & Co.,* Del.Super., C.A. No. 91C-04-289,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 5

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
(Cite as: Not Reported in A.2d)

Goldstein, J. (Sept. 15, 1992), for the proposition that it is improper for a court to grant a motion to dismiss on statute of limitations grounds whenever the complaint alleges fraudulent concealment as part of its claims. Plaintiffs, however, misread *Snyder. Snyder* stated that granting a motion to dismiss on statute of limitations grounds would be inappropriate where a plaintiff has "*successfully pled* fraudulent concealment." *Id* . at 9 (emphasis added). Where a plaintiff has successfully alleged a claim of fraudulent concealment "the affirmative statute of limitations defense turns on a question of fact," rendering a summary disposal inappropriate. *Id. Snyder* does nothing, however, to alter the general rule that when it is clear from the face of the complaint that the statute of limitations bars a plaintiff's claims, despite an allegation of fraudulent concealment, dismissal is still appropriate. *See Boeing Co. v. Shrontz,* op. at 4-5 (dismissing breach of fiduciary duty claims on statute of limitations grounds, despite allegation of fraudulent self-dealing).*See also Shockley v. Dyer,* Del.Supr., 456 A.2d 798, 799 (1983) (affirming grant of summary judgment, despite plaintiff's allegation of fraudulent concealment, where viewing the facts in a light most favorable to plaintiffs, "it becomes clear that by an exercise of due diligence plaintiff could have discovered her rights.").

### III. ANALYSIS

*A. Statute of Limitations*

It is well-settled under Delaware law that a three-year statute of limitations applies to claims for breach of fiduciary duty.[FN19]With the exception of the Falcon Classic Cable claim, which was a brand new claim as of the filing of the Amended Complaint on October 7, 1996, plaintiffs filed their pre-consolidation complaints on February 6, 9 & 15, 1996, alleging breaches of fiduciary duty by

Dean Witter and the general partners of the Partnerships.[FN20] Applying the three-year statute of limitations, any claim that accrued prior to February 6, 1993 (or prior to October 7, 1993, with respect to the Falcon Classic Cable claim) is barred by operation of the statute. If, however, plaintiffs' cause of action accrued on or after February 6, 1993 (or October 7, 1993, with respect to the Falcon Classic claim), then the claims are timely and can proceed.

> FN19.10 *Del. C.* § 8106; *Dofflemyer v. W.F. Hall Printing Co.,* D. Del., 558 F.Supp. 372, 379 (1983) (applying Delaware law).

> FN20. Under the Order of Consolidation, all documents previously filed and served in the cases consolidated by the Order were deemed filed, served and part of the record in the consolidated action. Only the three Court of Chancery cases were consolidated by that Order. The earliest of these cases-*Segel*-was filed February 6, 1996. Thus, February 6, 1996, is the earliest operative date for statute of limitations purposes. *See* Order of Consolidation ¶¶ 1, 9.

*B. Time of Accrual*

The general law in Delaware is that the statute of limitations begins to run, *i.e.,* the cause of action accrues, at the time of the alleged wrongful act, even if the plaintiff is ignorant of the cause of action.[FN21]Plaintiffs here complain of two different types of injuries. First, they allege that Dean Witter violated its fiduciary duties in the marketing and sale of the Partnerships. Second, plaintiffs allege that defendants [FN22] committed post-offering breaches of their fiduciary duties in connection with the management and oversight of the Partnerships.

> FN21.*David B. Lilly Co. v. Fisher,* D. Del., 18 F.3d 1112, 1117 (1994); *Isaacson, Stolper & Co. v. Artisan's Sav. Bank,* Del.Supr., 330 A.2d 130, 132 (1974)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

> FN22. Plaintiffs do not allege post-offering mismanagement with respect to Falcon Classic Cable. Complaint ¶¶ 266-68.

Plaintiffs allege that defendants breached their fiduciary duties in recommending and selling to plaintiffs Partnerships that would never (and could never) achieve their promised objectives. Accepting this allegation as true, plaintiffs' injuries occurred *when they purchased* their Partnership interests as a result of defendants' alleged misrepresentations. [FN23] Thus, plaintiffs' cause of action accrued when they invested in the allegedly fraudulent Partnerships. The Partnerships at issue were marketed and sold to the plaintiffs in the mid-to-late 1980s. The last of these sales was completed by the end of 1989.[FN24] Thus, with respect to the marketing and sale of the Partnerships, plaintiffs' cause of action accrued no later than year-end 1989. Absent tolling of the statute of limitations, these claims became stale at the end of 1992-years before plaintiffs filed their Amended Complaint.

> FN23. *Seidel v. Lee,* D. Del., C.A. No. 93-494-JJF, at 16, Farnen, C.J. (Dec. 30, 1996) (applying Delaware law) (fiduciary duty claim accrues when breach accomplished). *See also In re Merrill Lynch Ltd. Partnerships Litig.,* S.D.N.Y., No. 95 Civ. 10657(MBM), at 11-20 (Aug. 26, 1997) (applying federal RICO law, which has same standard for statute of limitations accrual).
>
> FN24. Complaint ¶¶ 9-23.

**\*5** With respect to the allegations of post-offering breaches arising out of the management and oversight of the Partnerships, plaintiffs allege that defendants operated the Partnerships to benefit themselves at the expense of the investors. Among other things, plaintiffs complain that Partnership real estate investments were chosen solely for the purpose of benefiting other Dean Witter affiliates and that the Partnerships paid excessive commissions and fees. For each Partnership, these

alleged violations of fiduciary duty began-and plaintiffs consequently began to suffer injury-shortly after each Partnership was formed. The Amended Complaint is replete with allegations of injudicious mortgage loans and unwarranted management commissions throughout the mid-to-late 1980s.[FN25] Thus, as with the marketing and sales claims, plaintiffs' cause of action regarding the alleged post-offering breaches accrued no later than year-end 1989.[FN26] Plaintiffs filed their complaint on February 6, 1996-well past the expiration of the three-year limitations period. *Absent tolling,* therefore, all of plaintiffs' claims fall outside the statutory period and would be time-barred.

> FN25. *See, e.g.,* Complaint ¶¶ 91-121 (Yield Plus), ¶¶ 129-35 (Yield Plus II), ¶¶ 136-46 (Yield Plus & Yield Plus II), ¶¶ 156-79 (Growth Properties), ¶¶ 193-98 (Income I), ¶¶ 209-16 (Income II), ¶¶ 233-39 (Income II, III & IV).
>
> FN26. *Dofflemyer,* 558 F.Supp. at 379 (fiduciary duty claim accrues at time of breach).

### C. Tolling

Plaintiffs allege that their claims are timely because the statute of limitations was tolled until January 26, 1996, when an article in the *Wall Street Journal* [FN27] -reporting that the Securities and Exchange Commission ("SEC") was negotiating with Dean Witter Reynolds and two other brokerage firms concerning their limited partnership sales practices during the 1980s and that a settlement fund might be established-first put them on notice of their potential claims.[FN28] Plaintiffs assert three separate theories to support a tolling of the statute of limitations in this case: (1) inherently unknowable injuries; (2) fraudulent concealment; and (3) equitable tolling. Each of these doctrines permits tolling of the limitations period where the facts underlying a claim were so hidden that a reasonable plaintiff could not timely discover them.[FN29]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                  Page 7
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
(Cite as: Not Reported in A.2d)

FN27. This article will be referred to as the "*Wall Street Journal* article" or the "article."

FN28. Pls.' Memo. in Opposition at 9.

FN29. *See, e.g., Playtex, Inc. v. Columbia Casualty,* Del.Super., C.A. No. 88C-MR-233, at 7, Del Pesco, J. (Sept. 20, 1993) ("Ignorance of the facts supporting a cause of action will not toll the statute, absent some special consideration such as ' inherently unknowable' injuries or fraudulent concealment.").

Under the doctrine of inherently unknowable injuries, the running of the statute of limitations is tolled while the discovery of the existence of a cause of action is a practical impossibility.[FN30] For the limitations period to be tolled under this doctrine, there must have been no observable or objective factors to put a party on notice of an injury, and plaintiffs must show that they were blamelessly ignorant of the act or omission and the injury.[FN31] Often, plaintiffs can establish " blameless ignorance" by showing justifiable reliance on a professional or expert whom they have no ostensible reason to suspect of deception.[FN32] This doctrine tolls the limitations period until a plaintiff had "reason to know" that a wrong has been committed. [FN33]

FN30. *Ruger v. Funk,* Del.Super., C.A. No. 93C-04-210, at 5-6, Lee, J. (Jan. 22, 1996).

FN31. *Seidel,* op. at 17.

FN32. *See, e.g., Isaacson,* 330 A.2d at 133-34 (applying "discovery rule" in light of relationship of "confidence and reliance by plaintiff on the expertise of defendant").

FN33. *Pack & Process, Inc. v. Celotex Corp.,* Del.Super., 503 A.2d 646, 650 (1985).

The statute of limitations will also be tolled if a defendant engaged in fraudulent concealment of the facts necessary to put a plaintiff on notice of the truth.[FN34] Unlike the doctrine of inherently unknowable injuries, fraudulent concealment requires an affirmative act of concealment by a defendant-an "actual artifice" that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry.[FN35] "Mere ignorance of the facts by a plaintiff, where there has been no such concealment, is no obstacle to operation of the statute [of limitations]."[FN36] Where there has been fraudulent concealment from a plaintiff, the statute is suspended until his rights are discovered or until they could have been discovered by the exercise of reasonable diligence. [FN37]

FN34. *Litman,* op. at 8.

FN35. *Halpern,* 313 A.2d at 143.

FN36. *Id.*

FN37. *Id.*

*6 Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary.[FN38] Underlying this doctrine is the idea that "even an attentive and diligent [investor] relying, in complete propriety, upon the good faith of [fiduciaries] may be completely ignorant of transactions that ... constitute self-interested acts injurious to the [Partnership]."[FN39] This doctrine tolls the limitations period until an investor knew or had reason to know of the facts constituting the wrong.[FN40]

FN38. *Yaw v. Talley,* Del. Ch., C.A. No. 12882, at 10, Jacobs, V.C. (March 7, 1994) (Fiduciaries who benefit personally from their wrongdoing, especially as a result of fraudulent self-dealing, will not be afforded the protection of the statute of limitations.).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

FN39.*Seaboard,* 625 A.2d at 275-76 (Given the fiduciary duties that the law imposes on corporate directors, stockholders are entitled to rely on the good faith of the directors when they act with respect to the corporation's property or processes.).

FN40.*In re Maxxam, Inc./Federated Dev. Shareholders Litig.,* Del. Ch., 659 A.2d 760, 769 (Feb. 13, 1995).

As the party asserting that tolling applies, plaintiffs bear the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled.[FN41] Significantly, if the limitations period is tolled under any of these theories, it is tolled *only until* the plaintiff discovers (or exercising reasonable diligence should have discovered) his injury.[FN42] Thus, the limitations period begins to run when the plaintiff is *objectively* aware of the facts giving rise to the wrong, *i.e.,* on inquiry notice.[FN43] Accordingly, for plaintiffs to establish that this action was filed in a timely manner, under any one of these theories, they must convince the Court that they were *not* on inquiry notice of their claims before February 6, 1993 (or before October 7, 1993, with respect to the Falcon Classic Cable claim).[FN44]

FN41.*United States Cellular,* 677 A.2d at 504;*Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, at 35, Allen, C. (Nov. 21, 1995).

FN42.*In re ML-Lee Acquisition Fund II, L.P. Litig.,* D. Del., 848 F.Supp. 527, 554 (1994) (inherently unknowable injuries); *United States Cellular,* 677 A.2d at 503 (equitable tolling); *Litman,* op. at 8 (fraudulent concealment).

FN43.*See Seidel,* op. at 16-17 (inherently unknowable injuries: statute tolled until such time as persons of ordinary intelligence and prudence would have facts sufficient to place them on inquiry notice of an injury); *Seaboard,* 625 A.2d at 275

(equitable tolling: statute of limitations does not run against plaintiff until he knows or has reason to know facts alleged to give rise to wrong); *Halpern,* 313 A.2d at 143 (fraudulent concealment: running of statute suspended only until plaintiff's rights are discovered or would have been discovered by exercise of reasonable diligence).*See also Nardo v. Guido DeAscanis & Sons, Inc.,* Del.Super., 254 A.2d 254, 256 (1969) (standard for length of tolling is the same for fraudulent concealment, equitable tolling and inherently unknowable torts).

FN44. Where the tolling of the statute of limitations turns on controverted issues of fact, a pre-discovery dismissal of the claim would be inappropriate. *See, e.g., In re Asbestos Litig.,* Del.Supr., 673 A.2d 159, 163 (1996) (only when the record is uncontroverted that plaintiff "discovered" his injury more than [three] years prior to filing his suit is summary judgment appropriate). However, when it is clear from the face of the complaint (and the documents incorporated by reference in it) that plaintiffs' tolling theories fail even to raise a legitimate doubt about the time the claims accrued, dismissal is appropriate if the claims were filed after the applicable limitations period expired. Plaintiffs cite *In re Maxxam* for the proposition that "a defendant should not be permitted to use the statute of limitations as a shield where the defendant possesses information critical to the existence of an actionable claim of wrongdoing and prevents the plaintiff from discovering that information in a timely fashion."*In re Maxxam, Inc./Federated Dev. Shareholders Litig.,* Del. Ch., C.A. Nos. 12111 & 12353, at 13, Jacobs, V.C. (June 21, 1995). The danger is in dismissing an action prematurely when plaintiffs do not yet have access to the information they need to state their claims fully. Here, it is clear to the Court that all of the necessary information was not only publicly available, but already in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 9

**Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203**
**(Cite as: Not Reported in A.2d)**

plaintiffs' hands at least as far back as 1990-an entirely different situation than the one presented to the *In re Maxxam* Court.

*D. Were Plaintiffs on Inquiry Notice?*

Defendants contend it is clear that, based on the allegations of the Amended Complaint, plaintiffs cannot under any circumstances show that the statute of limitations was tolled for the length of time necessary to render their action timely. First, defendants note that the very facts pleaded in the Amended Complaint demonstrate that plaintiffs were on inquiry notice of defendants' alleged wrongful conduct long before February 6, 1993 (or October 7, 1993, with respect to the Falcon Classic Cable claim). Second, defendants point out that other Partnership investors filed lawsuits against Dean Witter Reynolds alleging breach of fiduciary duty in connection with the same Proprietary Partnerships *before* the *Wall Street Journal* article was published.[FN45] That fact, defendants argue, shows conclusively that the existence of the claims was not beyond the grasp of the reasonably diligent investor. Finally, defendants make the practical argument that the *Wall Street Journal* article, touted by plaintiffs as their clarion call, could not possibly have provided the "essential missing information" that plaintiffs assert. The article simply did not disclose any information about Dean Witter's sales practices, nor did it identify any limited partnerships by name.

FN45. *See, e.g., Grigsby v. Dean Witter Reynolds Inc.,* Cal.Super. Ct., C.A. No. 695777 (filed Dec. 27, 1995) (asserting claims with respect to the Proprietary Partnerships); *McCoy v. Dean Witter Reynolds, Inc.,* E.D. Tenn., C.A. No. 94-5779 (regarding demand for arbitration filed Dec. 28, 1989, asserting claims with respect to Income I & II); *Eno v. Dean Witter Reynolds, Inc.,* N.Y. Sup.Ct., Index No. 127300/95 (regarding demand for arbitration filed May 25, 1994, asserting claims with respect to Income II).

Defendants emphasize that the allegations of wrongful conduct asserted in the Amended Complaint are based on events that all occurred in the mid-to-late 1980s. Moreover, every fact cited by plaintiffs in the Amended Complaint comes from disclosures in documents that were either provided to plaintiffs contemporaneously with the wrongful conduct now being alleged or publicly available Securities Exchange Commission ("SEC") filings made by the Partnerships.[FN46] As a matter of law, defendants assert, disclosures in any of those documents-the sole source of plaintiffs' allegations-were sufficient to place plaintiffs on inquiry notice of their claims long before February 6, 1993.

FN46. According to defendants, investors in each Partnership received from Dean Witter a prospectus (and all applicable supplements), annual and quarterly reports, and periodic "property profiles" describing properties in which the Partnership had invested. Each Partnership also filed with the SEC (and made available to investors on request) reports on Form 10-K, reports on Form 10-Q, and reports on Form 8-K. Defs.' Motion to Dismiss at 7-8.

The Court may properly consider the contents of the *Wall Street Journal* article, Partnership prospectuses, property profiles, customer account statements, quarterly and annual reports and SEC filings in considering this motion to dismiss, because by expressly referring to and so heavily relying on these documents in the Amended Complaint, plaintiffs have incorporated them by reference into the Amended Complaint. *Glaser v. Norris,* Del. Ch., C.A. No. 9583, at 9 n. 1, Chandler, V.C. (Jan. 6, 1992).

**\*7** Although the information they now use to support their allegations was publicly available at the time of the alleged wrongs, plaintiffs claim that they were prevented from discovering defendants' wrongful conduct prior to January 26, 1996, as a result of defendants' misrepresentations regarding the health of their Partnership investments. Until

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 10

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

reading the *Wall Street Journal* article, plaintiffs assert that they relied-and were entitled to rely-on defendants' assurances that the Partnerships' properties were performing better than comparable properties, that the Partnerships' losses were only temporary, and that these losses were not caused by any wrongful conduct on the part of defendants. In fact, the Partnerships' losses were accompanied by an overall real estate market decline. It was the publication of the article, plaintiffs contend, that first alerted them to their potential claims, *i.e.,* to the idea that their investment losses were the result of defendants' wrongful conduct rather than a general downturn in the real estate market. And it was not until, *after reading the article,* plaintiffs hired a consulting expert, who sifted through "more than 300 publicly-filed documents," that plaintiffs were able to reconstruct the Partnerships and actually discover defendants' wrongful conduct. [FN47] Accordingly, plaintiffs argue they were not on inquiry notice until January 26, 1996 and, therefore, that is the date the statute of limitations began to run.

FN47. Pls.' Memo. in Opposition at 3.

As noted above, the limitations period is tolled until such time that persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, *if pursued,* would lead to the discovery of the injury.[FN48] Inquiry notice does *not* require *actual* discovery of the reason for the injury. Nor does it require plaintiffs' awareness of all of the aspects of the alleged wrongful conduct. Rather, the statute of limitations begins to run when plaintiffs should have discovered the general fraudulent scheme.[FN49]Thus, the critical inquiry for purposes of this motion to dismiss is: were plaintiffs *entitled to rely* on defendants' representations for as long as they did, *i.e.,* up until publication of the January 26, 1996, *Wall Street Journal* article, or were they on inquiry notice before that date? [FN50]

FN48.*In re ML-Lee Acquisition Fund II, L.P. Litig.,* 848 F.Supp. at 554 (defendants' misrepresentations were unknowable until publication of the Annual Report

disclosing particular investment and its lack of success).

FN49.*McCoy v. Goldberg,* S.D.N.Y., 748 F.Supp. 146, 158 (1990) (statutory period does not await plaintiffs' leisurely discovery of the full details of the alleged scheme) (internal citations omitted). Although plaintiffs suggest that their claims were "unknowable" because it required an expert to uncover defendants' alleged wrongdoing, that argument is without merit. It may in fact have taken an expert to unravel the entire scheme alleged by plaintiffs. But having all of the facts necessary to articulate the wrong is *not* required. Rather, "[o]nce a plaintiff is in possession of facts sufficient to make him suspicious, or that ought to make him suspicious, he is deemed to be on inquiry notice."*Harner v. Prudential Secs. Inc.,* E.D. Mich., 785 F.Supp. 626, 633 (1992) (citations omitted), *aff'd,*6th Cir., 35 F.3d 565 (1994).

FN50. Defendants assert that when plaintiffs read the article, they responded by doing what they could have done several years earlier-they read the public documents and hired an expert to review them. Defs.' Motion to Dismiss at 15-16.

The Partnerships sustained steady losses from the outset. Plaintiffs allege that defendants purposely put them off the trail of inquiry by notifying them of these losses, while at the same time reassuring plaintiffs that the Partnerships were returning profits. [FN51]For example, plaintiffs "received regular distributions, falsely reassuring [them] regarding the financial condition of their investments."[FN52]In reliance on the fiduciary duties owed by defendants, plaintiffs assert that they "had no reason to go behind Defendants' campaign of misinformation" to discover the true source of the Partnership losses. [FN53]

FN51.*See, e.g.,* Income III, 1990 Annual Report at 1, attached to Affidavit of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

Ronald J. DiPietro (Dec. 10, 1996), Ex. 6-C (Docket No. 25) ("1990 was a difficult and disappointing year for real estate investments in general.... Fortunately, due to the high quality of its properties and size of its portfolio, the Partnership has been able to avoid the worst of the[ ] problems.... The cash distribution paid during the 1990 fiscal year was ... an annualized return of 6.25%.").

FN52. Pls.' Memo. in Opposition at 51.

FN53.*Id.* at 48.

**\*8** Plaintiffs specifically complain that the annual reports concealed the fact that these consistent cash distributions were actually a return of investors' capital rather than a "return on investment." FN54 Pointing to the 1990 Annual Report for the Yield Plus II Partnership as an example, plaintiffs assert that they could not have known that Partnership capital was being impaired, in light of the statement that the "distribution ... was an annualized return on investment of 7.5%."FN55But in the same annual report, three pages away on page four, is a chart showing clearly that the partners' capital had declined from the previous year. Moreover, from a chart on page six, it is apparent from even the most cursory glance that the amount of the cash distributions for the year 1990 far exceeded the Partnership's net income for the same year. These charts are not, as plaintiffs suggest, hard to understand, nor are they buried at the back of a thick report. The typical annual report for the Partnerships is no more than fifteen pages in length. While the distributions were maintained at a fairly high level, looking beyond the language on the first page of these annual reports, the fact that the distributions are consistently greater than the Partnership income *should have alerted* plaintiffs to the fact that something was amiss.

FN54.*See, e.g.,* Pls.' Memo. in Opposition at 7, 23-24, 26-28, 51.

FN55. Yield Plus II, 1990 Annual Report at 1, attached to Affidavit of Ronald J.

DiPietro (Dec. 10, 1996), Ex. 2-D (Docket No. 23).

Plaintiffs seek refuge in the proposition that where the statute of limitations inquiry involves claims of self-dealing by a fiduciary, "[t]he emphasis is upon the protection of the beneficiary of the fiduciary duty, so long as she is reasonably attentive to her interests, albeit trusting."FN56Accordingly, plaintiffs assert, the fiduciary relationship between plaintiffs and defendants in this case entitled plaintiffs to rely upon the presumed good faith and loyalty of defendants. Plaintiffs correctly point out that beneficiaries are entitled to trust their fiduciaries .FN57As a result, reasonable reliance on the competence and good faith of those who have assumed a legal responsibility toward a plaintiff can be sufficient to toll the running of the statute of limitations.FN58But, the trusting plaintiff still must be *reasonably attentive* to his interests. " *[B]eneficiaries should not put on blinders to such obvious signals as publicly filed documents, annual and quarterly reports, proxy statements, and SEC filings.*" FN59Thus, even where defendant is a fiduciary, a plaintiff is on inquiry notice when the information underlying plaintiff's claim is readily available.FN60

FN56.*Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, at 37, Allen, C. (Nov. 21, 1995).

FN57.*See, e.g., Borden v. Sinskey,* 3d Cir., 530 F.2d 478, 489, n. 10 (1976) (" Shareholders have no duty to search a corporation's records for evidence of misconduct on the part of corporate officers and directors. Rather, they are entitled to assume that those standing in a fiduciary relationship to them will be faithful to their charge.").

FN58.*Seaboard,* 625 A.2d at 275.

FN59.*Seidel,* op. at 18 (emphasis added).

FN60.*Id.* (rejecting plaintiff's inherently unknowable tolling argument because "the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 12

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
(Cite as: Not Reported in A.2d)

public documents, which form the basis of many of Plaintiff's claims, could have provided Plaintiff with adequate notice of an alleged misconduct by Defendants."). In the instant case, the public documents provide the basis for *all* of plaintiffs' claims. *See also In re USACafes, L.P. Litig.,* Del. Ch., C.A. No. 11146, 18 Del. J. Corp. L. 1204, 1213 (1993) ("[I]nterest holders need not delve aggressively into the internal affairs of a ... limited partnership in order to assure that a non-public, self-dealing transaction is not foreclosed from attack by limitations, but when facts are disclosed that give rise to inquiry, an applicable statute of limitations will require timely action to preserve rights.").

It is not too much to ask investors to read beyond the first page of an annual report, to read past the rosy forecasts and actually look at the cold, hard figures provided to them. Had plaintiffs bothered, for example, to read past the first page of the 1989 Annual Report for Income II-a document that was delivered to investors by mid-1990 at the latest-they would have been alarmed.[FN61] Although large distributions were being made, with a quick glance it is clear that the amount of these distributions far exceeded the "net income" figure.[FN62]In fact, the figures show the amount of the "partners' capital" steadily declining from 1986 to 1989.[FN63]Yet, the first page of this annual report states so optimistically: "The cash distribution paid for the 1989 fiscal year [constituted] an annualized return of 7%."This blatant contradiction should have been a "red flag" to any investor-and should have prompted an inquiry by plaintiffs into the health of their investments. [FN64]

FN61. Income II, 1989 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (July 11, 1997), Ex. C (Docket No. 52).

FN62. For the fiscal year 1989, the Income II Partnership shows a net income figure of $7,043,996 and cash distributions of

$13,768,450. *Id.* at 7.

FN63.*Id.*

FN64.*In re Prudential Sec. Inc. L.P. Litig.,* S.D.N.Y., 930 F.Supp. 68, 76 (1996) (" Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of that fraud will be imputed to him.").

*9 The presence of this inherently contradictory information in each Partnership's annual report starting in the late 1980s for the earlier Partnerships and its appearance in all of the Partnerships by 1990 compels the conclusion that plaintiffs were not reasonably attentive to their investment interests. [FN65] Plaintiffs were not entitled to sit idly by, blindly relying on defendants' assurances, when the documents and disclosures plaintiffs received regularly were so suggestive of mismanagement. [FN66] Whether accompanied by optimistic projections or not, these discrepancies alone were sufficient notice of wrongdoing to prompt inquiry into the Partnerships. Upon receipt for each Partnership of the first annual report revealing cash distributions in excess of net income, plaintiffs were on inquiry notice of their claims.[FN67]

FN65.*See, e.g.,* Income I, 1989 Annual Report, Ex. A; Income II, 1989 Annual Report, Ex. C; Income III, 1989 Annual Report, Ex. L; Income IV, 1989 Annual Report, Ex. M; Growth Properties, 1989 Annual Report, Ex. D (attachments to the Affidavit of Ronald J. DiPietro (July 11, 1997) (Docket No. 52)); Yield Plus, 1989 Annual Report, Ex. 1-D; Yield Plus II, 1990 Annual Report, Ex. 2-D (attachments to Affidavit of Ronald J. DiPietro (Dec. 10, 1996) (Docket No. 23)); Falcon Classic Cable, 1990 Annual Report, Ex. B (attachment to Affidavit of Mary Lou Frick (Dec. 10, 1996) (Docket No. 26)).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

FN66.*See, e.g., Playtex, Inc. v. Columbia Casualty,* Del.Super., C.A. No. 88C-MR-233, at 7, Del Pesco, J. (Sept. 20, 1993) ("inherently unknowable" theory of tolling did not apply where a "wealth of information regarding [the cause of action] was generally available" when the fraud occurred); *Halpern,* 313 A.2d at 143 (statute is tolled only for the "period of fraudulent concealment").

FN67.*See Ruger v. Funk,* op. at 6 ("Actual discovery surely commences the running of the statute; so will any change in circumstances that renders the injury no longer inherently unknowable, or the ignorance of the party-plaintiff no longer blameless.").

The Amended Complaint also alleges that such "deceptive" cash distributions were used to promote the sale of later Partnerships, and the purchasers of the later Partnerships would have no reason to review the financial information/materials for the earlier Partnerships. Assuming this is true, it still should have been obvious to the investors soon after receiving their annual reports that the cash distributions *they* were receiving were inflated and not reflective of actual earnings. Perhaps for one year, this would not raise too much concern, but certainly after the second or third straight year of cash distributions that far exceeded Partnership income, accompanied by a commensurate decline in partners' capital, plaintiffs should have been aware that the cash distributions they were receiving were not the result of investment gains-and that they were most likely duped into purchasing the Partnerships in the first place. The inherent contradiction between the distributions-described in these annual reports as "annualized returns"-and the declining partners' capital and net income lower than the distributions should have caused plaintiffs to question whether the touted cash distributions of the earlier partnerships were truly indicative of

profits. That is inquiry notice. *Queen Anne Pier Condominium Council v. Raley,* Del.Super., C.A. No. 85C-JA10, at 8, Lee, J. (Jan. 26, 1988) (inquiry notice means the existence of facts sufficient to put person of ordinary intelligence and prudence on inquiry which, *if pursued,* would lead to the discovery).

### IV. CONCLUSION

On the basis of this record, I conclude that the information in the annual reports alone should have provided plaintiffs with adequate notice of any alleged misconduct by defendants.[FN68] Based on the facts alleged in the Amended Complaint, drawing all inferences in favor of plaintiffs, I conclude that plaintiffs were clearly on inquiry notice of their claims long before February 6, 1993 (or before October 7, 1993, with regard to the Falcon Classic Cable claim).[FN69] The limitations period for this cause of action is three years. Plaintiffs' February 1996 filing (the earliest of plaintiffs' filings) comes *more* than three years after they were placed on inquiry notice. For these reasons, I grant defendants' motion to dismiss on the ground that the plaintiffs' claims are time-barred by operation of the statute of limitations.[FN70]

FN68. Although I conclude that the glaring inconsistencies contained in the annual reports were sufficient, in and of themselves, to place plaintiffs on inquiry notice of their potential causes of action, those discrepancies were not the only indications plaintiffs had of their potential claims. I need not address them in substance (as I find the material in the annual reports dispositive on the issue), but I am inclined to agree with defendants' other assertions of plaintiffs' inquiry notice: (1) that plaintiffs were on notice no later than 1992, when defendants changed the format of their monthly account statements to reflect the true, rather than par, value of the Partnerships. *See In re Prudential Sec. Inc. L.P. Litig.,* 930 F.Supp. at 76-77; (2) that some investors

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                      Page 14

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

in the Partnerships did manage to file lawsuits against the very same limited partnerships *before* January 26, 1996, suggests the alleged wrongful conduct was detectable by the average investor; and (3) that the *Wall Street Journal* article neither disclosed any concrete information about sales practices or the investments in question, nor mentioned by name the limited partnership defendants in this case, thus raising a serous doubt as to how the article alone could have prompted such an inquiry.

FN69.*Cf. Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, Allen, C. (Nov. 21, 1995) (motion to dismiss denied because issue of plaintiffs' inquiry notice was in dispute).

FN70. Plaintiffs' request, in the alternative, to amend their Amended Complaint is hereby denied. No amendment would cure the fatal flaw in plaintiffs' current Amended Complaint-that it was filed too late.*Glaser v. Norris,* Del. Ch., C.A. No. 9538, at 30-31, Chandler, V.C. (Jan. 6, 1992) ("A court should deny leave to amend a complaint when the amendment would be futile due to the insufficiency of the proposed amendment.")

IT IS SO ORDERED.

Del.Ch.,1998.
In re Dean Witter Partnership Litigation
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Attached Printing Summary Report for MCGONIGLE,PATRIC 6247412**

| | |
|---|---|
| Date/Time of Request: | Friday, November 09, 2007 10:42:00 Central |
| Client Identifier: | 40307.001 |
| Database: | DE-CS |
| Citation Text: | Not Reported in A.2d |
| Lines: | 254 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

MARK BONK, as trustee of the Harry and    :
Patricia Bonk Irrevocable Trust, HARRY    :
BONK and PATRICIA BONK,    :     C.A. No. 06-285
   :
          Plaintiffs,    :
   :
       v.    :
   :
RICHARD WEZNER,    :
JOHN HANCOCK MUTUAL LIFE    :
INSURANCE CO., and METLIFE, INC.,    :
   :
          Defendants.    :

**PLAINTIFFS' ANSWERS AND OBJECTIONS TO
DEFENDANT JOHN HANCOCK'S FIRST SET OF INTERROGATORIES**

Plaintiffs, by and through their undersigned counsel, hereby provide their answers to the

First Set of Interrogatories from John Hancock Mutual Life Insurance Co. ("Defendant") as

follows:

### General Responses and Objections

A.      Plaintiffs serve the following Answers and Objections to Defendant, pursuant to

the applicable provisions of the Federal Rules of Civil Procedure and the Local Rules of this

Court, and therefore, object to any definition or instruction inconsistent with those rules.

B.      Plaintiffs object to Defendant's interrogatories as they request information that is

beyond the scope permitted under the Federal Rules of Civil Procedure which are applicable to

this proceeding.

C.      Plaintiffs' investigation is ongoing and all responses to the interrogatories and

requests for production of documents are based on the information acquired to date. Plaintiffs

reserve the right to amend, supplement or change their responses should information come to

light through further investigation that would so warrant an amendment, supplementation or change.

D.    Plaintiffs object to Defendant's interrogatories insofar as they are not disposed to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.

E.    The information supplied in these answers is not based solely on the knowledge of the executing party but includes the knowledge of the party's agents, representatives, and attorneys, unless privileged.

F.    The word usage and sentence structure may be that of the attorney assisting in the preparation of these answers and thus does not necessarily purport to be the precise language of the executing party.

G.    Plaintiffs object to these interrogatories to the extent that they call for information protected from disclosure by the attorney/client privilege, accountant/client privilege or work product doctrine.  Plaintiffs' responses that indicate that documents responsive to Defendant's requests have been produced or will be produced exclude documents as to which a privilege is or may be asserted.

H.    Each answer to the interrogatories detailed below is made subject to and without waiver or limitation of the foregoing matters.  In addition, Plaintiffs have interposed particular objections to certain interrogatories and/or requests for admissions and/or request for production of documents, but have nevertheless responded to the interrogatory and/or request for admission and/or request for production of documents.  Each response is made subject to and in accordance with these objections, and Plaintiffs do not waive any objections by providing these answers and objections.

I.      Plaintiffs object to Defendant's interrogatories insofar as they seek information that is prepared in anticipation of litigation or for trial and/or which constitutes work product, mental impressions, conclusions, opinions, or legal theories of counsel or other representatives of Plaintiffs concerning this and/or related litigation.

J.      Plaintiffs object to Defendant's interrogatories insofar as they are overly broad, unduly burdensome, and oppressive.

K.      Plaintiffs object to Defendant's interrogatories insofar as they are vague or otherwise unclear as to the precise information sought.

L.      Plaintiffs object to Defendant's interrogatories insofar as they seek disclosure of facts known or opinions held by experts, which may be obtained only in accordance with the Federal Rules of Civil Procedure.

M.      Plaintiffs object to Defendant's interrogatories to the extent they seek information which is part of public record to which the moving party has equal access, or otherwise already in its possession.  Plaintiffs hereby incorporate by reference earlier answers to interrogatories served by co-defendants.

N.      Plaintiffs object to Defendant's interrogatories to the extent they seek information that is confidential or proprietary.

Subject to the general objections set forth above and to the additional specific objections set forth below, and without waiving any objection, Plaintiffs answer Defendant's interrogatories as set forth below.

## INTERROGATORIES

1. For each person whom you know or believe has knowledge or information concerning, referring, or relating to any of your claims and allegations in any and all of the paragraphs of the Complaint regarding John Hancock, identify each such person, and describe in detail that individual's knowledge or information.

   ANSWER:     Subject to the foregoing General Objections, Plaintiffs, Harry Bonk, Patricia Bonk and Mark Bonk, and their counsel, have factual knowledge of the claims and allegations set forth in the Complaint. Other persons identified in documents produced by Plaintiffs (*see*, Bonk 1-881), including Richard Wezner and employees/representatives of Defendants, presumably have a certain knowledge as well. However, Plaintiffs are unable to describe such person(s) knowledge or information.

2. Identify each person whom you have retained, or intend to retain, as an expert in this matter and separately for each such expert describe in detail: the substance of the facts and opinions to which each such expert is expected to testify and the grounds for each such opinion; and describe in detail all prior retentions, relationships, dealings, and transactions between each such expert and/or you, and/or your attorneys, if any.

   **ANSWER:**     In addition to the General Objections, Plaintiffs object to this Interrogatory on the grounds that it exceeds the scope of discovery permitted by Rule 26. Without waiving these objections, Plaintiffs have retained Raymond N. Ianni, of DVFG Advisors, LLC. Mr. Ianni's report is attached hereto.

3. Identify and describe in detail all communications, correspondence, memoranda or other documents between or among you and any past or present officer, director, manager, supervisor, affiliate, general agent, or employee of John Hancock and/or any of the other defendants in this matter concerning, relating to, or referring to any of the claims and allegations you have made, or will make, in this case, and provide copies of all such documents.

   **ANSWER:**     In addition to the foregoing General Objections, Plaintiff objects to this Interrogatory as unduly burdensome and overly broad and seeks information that is obtainable

from documents in the possession of Defendant. Without waiving these objections, Plaintiffs refer Defendant to the documents produced by Plaintiffs in this action (*see*, Bonk 1 – 881). In further response, Plaintiffs, mainly Harry and Patricia Bonk, had numerous communications, both verbal and face-to-face, with Richard Wezner, during the time frame referred to in the Complaint. While Plaintiffs can not recall specific details of each and every communication with Richard Wezner, Plaintiffs recall the following:

Plaintiffs believe that Richard Wezner first met with the Bonks in connection with Wezner's solicitation of them for life insurance. Wezner secured the "Original Policies" (all defined terms are those ascribed to them in the "Complaint") on the lives of the Bonks. Sometime after the policies were in effect and after more than $100,000.00 cash value had accumulated, Mr. Wezner called Mr. Bonk informing Mr. Bonk that he could reduce the premiums by going with another insurance company. Mr. Wezner explained to Mr. Bonk that the insurance company or companies that were offering reduced premiums were companies that were doing financially well and could offer the lower premium rates. Mr. Bonk specifically recalls asking Mr. Wezner whether the cash value of the Original Policies would be reduced, and Wezner assured him that the cash values would not be negatively impacted. Some days or even perhaps weeks later, Mr. Wezner traveled to Milton, DE to the family's farming operation offices (known as the "Ranch"), and had Mr. and Mrs. Bonk sign the last page forms in blank, i.e., not filled in or typed.

The above "routine" occurred at least on two (2) other occasions that the Bonks can recall. Each time Mr. Wezner called Mr. Bonk and said that he could reduce premiums, maintain the same levels of coverage or even increase the levels of coverage. Mr. Bonk would ask whether the cash values would be decreased, and when Mr. Wezner assured him they would not, he verbally agreed to the new policies over the phone. Each time Mr. Bonk specifically asked Mr. Wezner about the accumulated cash value. In one particular discussion in a transaction after the Original Policies transaction, Mr. Wezner informed Mr. Bonk that the cash value would continue to grow and estimated that during the Bonks lifetime the cash value would be at least $1,000,000.00. Mr. Wezner also informed that at some point at a given age the Bonks would no longer be required to pay premiums. In each of the subsequent "transactions", Wezner again showed up at the Ranch either late in the evening or on weekends and presented a single page form to be signed by Mr. and Mrs. Bonk. These forms were either blank, or had some notations in pencil. Each time Mr. Wezner informed the Bonks given the time of day or the fact that it was a weekend that he could not get the forms typed and that he would have his office handle that task at a later time.

In each of the above described transactions, the Bonks never received copies of what they had signed in front of Wezner, and in fact never received any documents, including statements or evaluations or the like from any insurance companies. On one particular visit with Mr. Wezner, Mr. Wezner informed Mrs. Bonk that he had arranged for someone to give her a medical exam in connection with her life insurance.

Sometime thereafter, the Bonks received a phone message from an unidentified insurance company representative inquiring of the Bonks health and asking beneficiary information. Mr. Bonk left a message for Mr. Wezner after receiving the insurance company's message. Mr.

Wezner then left a message for the Bonks informing the Bonks to disregard the insurance company's message. That is the last time the Bonks heard Mr. Wezner's voice.

At all times relevant to the Complaint, the Bonks assumed Mr. Wezner worked for MetLife or Lincoln or whomever he was representing in connection with life insurance policies for the Bonks. The Bonks recall Mr. Wezner informing them each time that he either worked for or represented these companies and at one time identified a company called Pennsylvania Law Review of which he was associated. In addition, the Bonks recall at least one, but probably two, face-to-face discussions with MetLife representatives in Milton wherein those representatives were seeking information in respect to MetLife's "employee", Mr. Wezner. Mark Bonk had numerous telephone discussions with MetLife representatives wherein those representatives were seeking information about Wezner, an "employee" of MetLife. Plaintiffs further refer Defendant to the documents produced by Plaintiffs, which contain handwritten notes of Mark Bonk.

4.  If any person has given a statement or factual information, oral or written (herein "statement(s)") to you or to your attorney about this case, identify the person who gave each such statement(s) and summarize the information in each such statement(s).

    **ANSWER:**    Subject to the foregoing General Objections, none.

5.  With respect to your claims for monetary damages that you seek in this action against John Hancock:

    (a)  set forth the specific relief and damages sought, including the amount of each item of damages, and the factual basis upon which you seek such damages; and

    (b)  identify all individuals whom you know, or have reason to believe, have information supporting, referring or regarding these claims

    **ANSWER:**    Subject to the foregoing General Objections, Plaintiffs refer Defendant to the factual allegations of the Complaint and documents produced by Plaintiffs. In further response, Plaintiffs state that discovery is on-going and Plaintiffs are in the process of reviewing documents recently produced by defendants in this action and reserves the right to supplement and/or amend this answer.

In further response, Plaintiffs state they have retained the services of Raymond N. Ianni, CFP, ChFC of DVFG Advisors, LLC to assist in their damage analysis. Mr. Ianni's report is attached hereto.

6. Describe in detail and set forth the entire basis for your contentions in paragraph 8 of your

   Complaint that Wezner was employed by John Hancock until 1999 and that he joined,

   and/or was employed by, MetLife in 1999, and identify all persons with knowledge of such

   contentions.

   **ANSWER:**     Subject to the foregoing General Objections, Plaintiffs refer Defendant to the factual allegations of the Complaint and documents produced by Plaintiffs. In further response, Plaintiffs state that discovery is on-going and Plaintiffs are in the process of reviewing documents recently produced by defendants in this action and reserves the right to supplement and/or amend this answer.

   Without waiving the foregoing Objections, Plaintiffs state that the documents produced by Defendant show that Wezner was a registered representative with Defendant/Signator from April 1994 through December 31, 1996. Thereafter, Wezner's status was changed to Independent Broker status with Defendant effective January 1, 1997  and maintained a registered representative status with Defendant/Signator as broker-dealer, and maintained servicing agent role on the relevant variable life policies from January 1, 1997 through February 26, 1999. Wezner terminated his registered representative status with Defendant/Signator on February 26, 1999 and thereafter, became a full-time agent/registered representative with MetLife and MetLife Securities in or about March 1999.

   Plaintiffs believe Wezner, and representatives of Defendant/Signator and MetLife have knowledge of such contentions.

   In further response, Plaintiffs refer Defendant to the Report of Raymond Ianni, attached hereto.

7. Describe in detail and set forth the entire basis for your contentions in paragraph 9 of your

   Complaint that in 1999, while employed by John Hancock, Wezner convinced the Bonks to

   surrender the Original Life Policies and purchase two new policies (Replacement Life

   Policies) and identify all persons with knowledge of such contentions.

   **ANSWER:**     Subject to the foregoing General Objections, Plaintiffs refer Defendant to the factual allegations of the Complaint and documents produced by Plaintiffs. In further

response, Plaintiffs state that discovery is on-going and Plaintiffs are in the process of reviewing documents recently produced by defendants in this action and reserves the right to supplement and/or amend this answer.

Without waiving the foregoing Objections, Plaintiffs refer Defendant to the report of Raymond Ianni, attached hereto.    In further response, Plaintiffs believe Wezner, and representatives of Defendant/Signator and MetLife have knowledge of such contentions.

8.   Describe in detail and set forth the entire basis for your contentions in paragraphs 49 and 50

of your Complaint that until 1999, Wezner was employed by John Hancock for the purpose

of selling life insurance policies and other products and that when the conduct alleged in the

Complaint herein occurred, Wezner was authorized by John Hancock to sell life insurance

policies, including the Replacement Life Policies, and identify all persons with knowledge

of such contentions.

**ANSWER:**       Subject to the foregoing General Objections, Plaintiffs refer Defendant to the factual allegations of the Complaint and documents produced by Plaintiffs.    In further response, Plaintiffs state that discovery is on-going and Plaintiffs are in the process of reviewing documents recently produced by defendants in this action and reserves the right to supplement and/or amend this answer.

Without waiving the foregoing Objections, Plaintiffs refer Defendant to the report of Raymond Ianni, of DVFG Advisors, LLC, attached hereto.    In further response, Plaintiffs believe Wezner, and representatives of Defendant/Signator and MetLife have knowledge of such contentions.

9.  Describe in detail and set forth the entire basis for your contentions in paragraph 51, 52 and

    53 of your Complaint that the sale of the Replacement Life Policies occurred within

    authorized spatial and temporal limits as prescribed by Wezner's job duties with John

    Hancock, and that Wezner's sale of the Replacement Life Policies was actuated by the

    purpose to carry out his job duties and to serve the needs of John Hancock and occurred

    within the scope of his employment, and identify all persons with knowledge of such

    contentions.

    **ANSWER:**    Subject to the foregoing General Objections, Plaintiffs refer Defendant to
the factual allegations of the Complaint and documents produced by Plaintiffs.  In further
response, Plaintiffs states that discovery is on-going and Plaintiffs are in the process of reviewing
documents recently produced by defendants in this action and reserves the right to supplement
and/or amend this answer.

    Without waiving the foregoing Objections, Plaintiffs refer Defendant to the report of
Raymond Ianni, attached hereto.  In further response, Plaintiffs believe Wezner, and
representatives of Defendant/Signator and MetLife have knowledge of such contentions.

10.  Describe in detail and identify all communications that you had with defendant Richard

    Wezner, and with all alleged employees, agents, and/or or general agents of, or affiliated

    with, John Hancock supporting, refuting, regarding, referring or relating to the allegations

    against Wezner and John Hancock in the Complaint.

    **ANSWER:**    Subject to the foregoing General Objections, see response to Interrogatory
No. 3.

11.  Describe in detail and set forth the nature, basis for, and exact amount of the monetary

    damages to Plaintiffs you allege were caused by the replacement of the Original Life

    Policies by the Replacement Policies, as alleged in your Complaint.

    **ANSWER:**    Subject to the foregoing General Objections, Plaintiffs refer Defendant to
the factual allegations of the Complaint and documents produced by Plaintiffs.  In further
response, Plaintiffs state that discovery is on-going and Plaintiffs are in the process of reviewing

documents recently produced by defendants in this action and reserves the right to supplement and/or amend this answer.

In further response, see Report of Raymond N. Ianni of DVFG Advisors, LLC.

12. Identify all persons whom you contend you communicated with, corresponded with, or obtained information or documents from regarding, referring or relating to the Original Life Policies and the replacement of the Original Life Policies by the Replacement Life Policies and identify and describe and set forth in detail the nature and content of those communications, correspondence, and information.

**ANSWER:** In addition to the foregoing General Objections, Plaintiffs object to this Interrogatory as unduly burdensome and overly broad. Without waiving these objections, Plaintiffs refer Defendant to the documents produced by Plaintiffs in this action (*see*, Bonk 1 – 881) as well as documents produced by other parties. In further response, Plaintiffs state there may have been oral communications that occurred in the past but Plaintiffs are not, at this time, able to recall the date, time and length of the communications, nor the specifics of the communications.

Without waiver of any objection, see Response to Interrogatory No 3.

13. Identify all attorneys, advisors, consultants, and other individuals with whom you consulted, or obtained or sought information or advice from, regarding the alleged transactions and dealings with Wezner and John Hancock, including, but not limited to, those transactions and dealings regarding the Replacement of the Original Life Policies by the Replacement Life Policies, as alleged in paragraphs 6 through 11 and 49 through 52 of your Complaint.

ANSWER: In addition to the General Objections, Plaintiff objects to this Interrogatory on the grounds that it exceeds the scope of discovery permitted by Rule 26. Without waiving these objections, Plaintiffs state they have retained the services of Raymond N. Ianni, CFP, ChFC of DVFG Advisors, LLC to assist in their claim and damage analysis.

SEITZ, VAN OGTROP & GREEN, P.A.

R. KARL HILL (DE2747)
khill@svglaw.com
PATRICIA P. MCGONIGLE (DE3126)
222 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Telephone (302) 888-0600
Facsimile (302) 888-0606
Attorneys for Plaintiffs

Dated: September 20, 2007